UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


MARY ROBIN AND RUSSELL FINCHAM
III, Co-Administratrix  of the Estate of Russell
Meade Fincham IV,

      Plaintiff,

v.

GARRY MCFADDEN,  Mecklenburg Co., in
his official capacity as  Sheriff of
Mecklenburg County; MECKLENBURG
COUNTY; PLATTE RIVER INSURANCE,
as surety for the Sheriff; C. KING;
Mecklenburg Co., in his official and
individual capacity, COBIYAN
FETHERSON, Mecklenburg Co.,  in his
official and individual capacity, Defendant
FLEMING, Mecklenburg Co.,  in his official
and individual capacity; WELLPATH, LLC;
C. ENGLERT, R.N.; and SAMANTHA
ELLIOTT-MCLAREN, R.N., TRACELLAR
SMITH, R.N., and INDREA WARREN, R.N.

      Defendants.

_____/

**COMPLAINT**
**(Jury Trial Demanded)**


      NOW COMES the Plaintiffs, complaining of the Defendants, and files this Complaint,

and alleges and says:

### NATURE OF THE CASE

1.     On July 6, 2022, Russell Fincham, IV, a 25-year-old male who was a pre-trial resident

detained in the Mecklenburg County Detention Center ("MCDC"), died of fentanyl intoxication

while in the care, custody, and control of detention officers, their agents and their supervisors.

2.      Fentanyl is a prescription opioid commonly used as an anesthetic/analgesic. It is reported to be 80 to 200 times as potent as morphine and has a rapid onset of action as well as addictive properties. Signs associated with fentanyl toxicity include severe respiratory depression, muscle rigidity, seizures, hypotension, coma and death.

3.      Mr. Fincham's death was caused by the deliberate practice of officers at MCDC failing to supervise detention officers' rounds and failing to properly conduct direct observations of inmates ("residents") known to be vulnerable, such as Mr. Fincham.

4.      Mr. Fincham died as a result of emergency medical care not being provided despite clear notice of his dire condition after he displayed indicators of opioid withdrawal.

5.      Mecklenburg County, Sheriff McFadden and MCDC intentionally delegated its responsibility for medical supervision and arranging emergency medical care of inmates to a contractor, Wellpath, LLC.

6.      Mecklenburg County Sheriff Garry McFadden's written policies demonstrate an awareness of the significant risk posed to residents if left unattended. These policies alerted detention officers and their supervisors to this substantial risk and outline the required actions to protect residents from being left unattended, as well as to secure emergency medical care if a resident shows signs of needing emergency attention.

7.      In practice, however, the Sheriff McFadden's written policies were routinely disregarded by the MCDC detention officers and their supervisors in the MCDC and in the Sheriff's Office, and by the Sheriff himself.

8.      As a result, on July 6, 2022, in view of the control room both through the glass wall and on the security camera monitors, Mr. Fincham, while suffering from fentanyl intoxication, was left in his cell unattended and unsupervised.

9.      Despite being in view of the control room from both through the glass wall and on the security camera monitors, detention officers took no action over the course of an hour and a half while Mr. Fincham was suffering from opioid withdrawals.

10.     Defendant detention officers and medical staff failed to observe indicators posed by Mr. Fincham's opioid withdrawal.

11.     Detention officers failed to conduct their mandated rounds, which required officers to conduct timely supervision rounds.

12.     Detention officers observed Mr. Fincham's cell only one time between the hours of 5 am and 6 am.

13.     Had Defendants observed Mr. Fincham's cell as required, the detention officers would have seen that Mr. Fincham was in distress and needed immediate emergency medical attention.

14.     Neither the detention officers nor Wellpath, LLC employees took appropriate action to timely obtain emergency medical attention for Mr. Fincham.

15.     Despite Mr. Fincham's serious condition, the detention officers and Wellpath, LLC employees failed to seek emergency medical attention.

16.     Had the detention officers and their supervisors acted to secure medical attention for Mr. Fincham's emergency medical needs related to opioid withdrawals, Mr. Fincham would not have died of fentanyl intoxication.

17.     Plaintiffs bring this action under 42 U.S.C. § 1983 for deliberate indifference to Mr. Fincham's safety and to his emergency medical needs in violation of the Fourteenth Amendment and under North Carolina law for wrongful death.

18.     Plaintiffs are suing the Mecklenburg County Sheriff, whose policy of deliberate indifference resulted in Mr. Fincham's death, and those in the Mecklenburg County Sheriff's

Office and at the Mecklenburg County Detention Center who carried out the policy. Plaintiffs also sue jail medical staff who worked for Wellpath LLC, a contracted medical provider for inmates in the care and custody of Defendant McFadden.

19. Mary Robin and Russell Fincham, individually and as the administrators of the decedent's estate (Mecklenburg County File No. 24-E001950-590), files suit bringing claims under 42 U.S.C. § 1983 against the Mecklenburg County Sheriff's Department, which is responsible for the care and custody of inmates in the Jail, and several employees of the Sheriff's Department individually, as well as Wellpath, LLC and its employees. Specifically, claims under the Fourteenth Amendment for the detention officer's deliberate indifference to Mr. Fincham's risks due to opioid withdrawal. The Estate also alleges violations of state law.

20. The action and inaction of the defendants were objectively unreasonable in that the Defendants should have known of Mr. Fincham's condition and the risks and failed to act accordingly.

## PARTIES, JURISDICTION & VENUE

### Plaintiffs

21. Plaintiffs Mary Robin and Russell Fincham III, citizens and residents of Mecklenburg County, are bringing this action, under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law, in their capacities as the duly-appointed Co-Administrators of the Estate of their deceased son, Russell Meade Fincham IV, who died on July 6, 2022, while in the custody of Defendant Garry McFadden and his officers in the Mecklenburg County Detention Facility.

22. Plaintiffs were duly appointed Co-Administrators by the Clerk of Superior Court in Mecklenburg County file no. 24E001950-590.

23. Plaintiffs are the personal representatives of Mr. Fincham's estate per N.C.G.S. Stat. §§ 28A-18-1, 28A-18-2, 28A-18-3.

**Defendant Sheriff McFadden**

24.     On July 6, 2022, Defendant Garry McFadden ("McFadden " or "Sheriff McFadden ") was the elected Sheriff of Mecklenburg County, charged by statute with control and operation of the MCDC (sometimes, the "jail"). He is sued in his official capacity for both state-law and federal law claims.

25.     Sheriff McFadden was elected Sheriff on December 4, 2018. At all times relevant to this Complaint, Sheriff McFadden had custody of the jail under N.C.G.S. § 162-22, had a non-delegable responsibility for the maintaining of adequate supervision of the jail under N.C.G.S. § 162-24, and was the final policymaker for the jail for purposes of 42 U.S.C. § 1983.

26.     At all times relevant, McFadden acted under color of state law.

27.     Sheriff McFadden's legal obligations include the specific duty under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees in order "to be at all times informed of the prisoners' general health and emergency medical needs." He is sued in his official capacity under N.C.G.S. § 58-76-5 and N.C.G.S. § 153A-435. He is also sued officially as the final policymaker responsible for the unlawful practices at the MCDC. Those practices include the systematic (1) failure to supervise observation rounds, (2) failure to make direct observations, and (3) failure to properly staff the jail despite knowing the jail was overpopulated.

28.     Sheriff McFadden and the Sheriff's Office has a custom of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care and the systematic failure to supervise pre-trial detainees in accordance with correctional standards and state law and regulation, practices that led to the death of Mr. Fincham and at least seven (7) other residents at the MCDC in the three (3) years immediately preceding Mr. Fincham's death. Those practices also include the failure to provide sufficient competency-based training for his detention facility officers and other agents in recognizing when a resident needed immediate medical intervention,

5

including recognizing and properly responding to those with medical needs with substantial risk of serious harm a practice that also led to the death of Mr. Fincham. Those practices also include the failure to conduct a complete and thorough investigation into the in-custody death of Mr. Fincham, which resulted in an inadequate investigation and the ratification of his detention staff and medical staff's conduct proximately resulting in Mr. Fincham's death. Those practices, taken under color of law, were objectively unreasonable and deliberately indifferent and shocking to the conscience, violating Mr. Fincham's Fourteenth Amendment right to due process and were a proximate cause of his death.

29. The Mecklenburg County Sheriff's Office maintained a custom or practice of failing to follow the direct observation rules.

30. Upon information and belief, Defendant McFadden was cited on a February 25, 2020, inspection for failure to follow the direct observation rules. An inspector from the North Carolina Department of Health and Human Services ("NCDHHS") found where several cell windows were blocked, making direct observation impossible.

31. Upon information and belief, MCDC had 6 deaths from 2017-2018, wherein, all passed the NCDHHS death inspection. After Defendant McFadden is sworn in as Sheriff in December of 2018, MCDC was cited for failures

32. Upon information and belief, the table below shows the increase in failed death investigations under Defendant McFadden from 2017 through 2023.

| Year | # Deaths | # Death Inv Failures | Reason for Failures |
|------|----------|----------------------|---------------------|
| 2017 | 1 | 0 | |
| 2018 | 5 | 0 | |
| 2019 | 1 | 1 | Supervision – Missed Rounds |
| 2020 | 3 | 1 | Supervision – Missed Rounds |
| 2021 | 3 | 2 | Supervision – Missed Rounds (all) |
| 2022 | 5 | 4 | Supervision – Missed Rounds (all) |
| 2023 | 3 | 3 | Supervision – Missed Rounds (all) |

6

33.     Upon information and belief, in 2020, Defendant McFadden objected to the proposed readoption of jails, local confinement facility rules 10 NCAC 143 regarding supervision rounds, suicide prevention programs, supervision rounds, medical plans, and screening of inmates.

34.     Upon information and belief, the table below shows the number of investigations from 2020 through 2023 for supervision failures at Mecklenburg Jail Central.

| Year | # Inspections | # Supervision Failures | Reason for Sup Failure |
|------|---------------|------------------------|------------------------|
| 2020 | 1 | 1 | Paper covering windows – Direct Observation violation |
| 2021 | 2 | 1 | Broken security camera |
| 2022 | 5 | 3 | Missed rounds (all) |
| 2023 | 2 | 2 | Missed rounds (all) |

35.     Upon information and belief, Defendant McFadden was cited for a violation of N.C.G.S. 153A-224 due to failing to have custodial staff present to provide continuous supervision and security, which was mentioned in NCDHHS's February 2, 2022, inspection.  Violation of that statute is a Class 1 misdemeanor.

36.     Upon information and belief, NCDHHS's correspondence to McFadden that stated the jail is unsafe mainly due to understaffing and includes many observations from NCDHHS that make it clear the jail is dangerous.

37.     Defendant Sheriff McFadden had an affirmative non-delegable duty under N.C.G.S. § 153A-221 to comply with minimum standards to provide supervision of prisoners to protect their safety, security, health and welfare, and to provide medical care to prisoners at the Mecklenburg County Detention Center. *See* State v.Wilson, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007).

38.     Upon information and belief, Sheriff McFadden, through Mecklenburg County, has waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participation in a government risk pool or through purchase of

7

commercial insurance that will indemnify him for any judgment against him or his employees named in this action.

39.     Further, N.C.G.S. § 153A-224 imposes an affirmative statutory duty upon Sheriff McFadden  and his MCDC employees to provide continuous custodial supervision of all persons in custody and "to be at all times informed of the prisoners' general health and emergency medical needs."  The violation of this mandatory statutory duty to keep each prisoner "protected" is a misdemeanor and creates an exception to and precludes the application of the doctrine of governmental immunity to the tort claims in this case.

40.     Further, N.C.G.S. § 162-55 imposes an affirmative statutory duty upon Sheriff McFadden and his jail employees to refrain from "do[ing], or caus[ing] to be done, any wrong or injury to the prisoners committed to his custody, contrary to law."  The violation of this mandatory statutory duty is also a misdemeanor and creates an exception to, and precludes application of, the doctrine of governmental immunity to the tort claims in this case.

41.     Further, the defense of governmental or sovereign immunity as a defense to Plaintiff's state law tort claims has been expressly waived, upon information and belief, by Mecklenburg County's adoption of a resolution that deems the creation of its funded reserve to be the same as the purchase of insurance under N.C. Gen. Stat. § 153A-435(a).

**Defendant Mecklenburg County**

42.      Defendant Mecklenburg County is a North Carolina county organized and existing under N.C.G.S. § 153A-10. Defendant Mecklenburg County has all the corporate powers set forth in N.C.G.S. § 153A-11, including the power to be sued. Defendant Mecklenburg County is a "unit" and "local government" under N.C.G.S. § 153A-216, et seq.

43.     Defendant Mecklenburg County has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail, under N.C.G.S. § 153A-218.

44.     Defendant Mecklenburg County maintains and operates the Mecklenburg County Detention Center, located at 801 East Fourth Street, Charlotte, NC, 28202.

45.     Defendant Mecklenburg County is responsible under N.C.G.S. § 153A-224 for ensuring the Detention Center custodial personnel provide continuous supervision to protect prisoners from harm.

46.     Defendant Mecklenburg County is responsible under N.C.G.S. § 153A-225 for developing an adequate medical plan to provide medical care to prisoners at the Mecklenburg County Detention Center, including the medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare. *See* Stockton v.Wake County, 173 F.Supp.3d 292, 303-04 (E.D.N.C. 2016).

47.     Defendant Mecklenburg County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the safety of residents from inadequate supervision, failure to make direct observations, and failure to address the serious medical needs of residents, like Mr. Fincham.

**Defendant Platte River Insurance**

48.     Defendant Platte River Insurance is a Nebraska company and sued as the Sheriff's surety under N.C.G.S. § 58-76-5.

49.     Upon information and belief, Platte River Insurance issued the statutorily mandated surety bond to Mecklenburg County Sheriff McFadden in July 2022, pursuant to N.C.G.S. § 58-76.

50.     On July 6, 2022, Sheriff McFadden was obligated under state law to obtain and maintain said surety bond and by doing so, waived sovereign immunity as to the claims in this matter, at least to the extent of the bond.

51.     Plaintiffs sue Platte River Insurance Company to recover on the Sheriff's bonds, respectively, for the neglect and/or malfeasance of Sheriff McFadden and his employees whose actions and inactions proximately caused Mr. Fincham's death.

### Defendant Fleming

52.     Upon information and belief, Defendant Fleming (hereinafter, "Fleming") was employed by Sheriff McFadden as a detention officer and was on duty at the jail that day on the evening of July 5, 2022, to the early morning of July 6, 2022. Upon information and belief, Sheriff McFadden assigned Defendant Fleming supervisory responsibility for the jail and either made him a "keeper" of the jail under N.C.G.S. § 162-22 or identified him or her under N.C.G.S. § 162-24 to assist Sheriff McFadden in operating the jail.

53.     In July 2022, Defendant Fleming was a keeper of the jail per N.C. Gen. Stat. § 162-55.

54.     Defendant Fleming is sued in his individual capacity with regard to any federal-law claims naming him as Defendant.

55.     Defendant Fleming is sued in his individual and official capacities with regard to any state-law claims naming him as Defendant.

56.     Defendant Fleming was working at the Mecklenburg County Detention Facility on July 6, 2022, and his failure to keep continuous custodial supervision of Mr. Fincham, including failing to keep Mr. Fincham under special watch, caused the death of Mr. Fincham.

### Defendant Cobiyan Fetherson

57.     Defendant Cobiyan Fetherson (hereinafter, "Fetherson") was employed by Sheriff McFadden  as a Detention Officer and was on duty as a supervisor at the jail on July 6, 2022.  He is currently a resident of Mecklenburg County, North Carolina.

58.     In July 2022, Defendant Fetherson was a keeper of the jail per N.C. Gen. Stat. § 162-55.

59.     Defendant Fetherson is sued in his individual capacity with regard to any federal-law claims naming him as Defendant.

60.     Defendant Fetherson is sued in his individual and official capacities with regard to any state-law claims naming him as Defendant.

61.     The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant C. Fetherson.

### Defendant C. King

62.     Defendant C. King    (hereinafter, "King") was employed by Sheriff McFadden  as a Detention Officer and was on duty at the jail on July 6, 2022.  He is currently a resident of Cherokee County, State of Georgia.

63.     In July 2022, Defendant King was a keeper of the jail per N.C. Gen. Stat. § 162-55.

64.     Defendant King is sued in his individual capacity with regard to any federal-law claims naming him as Defendant. He is sued in his individual and official capacities with regard to any state-law claims naming him as Defendant.

65.     The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Doe.

66.     To the extent Defendants Cobiyan Fetherson, C. King and/or Defendant Fleming assert public officer immunity, they are sued individually for conduct outside the scope of their authority

and for malicious, willful and wanton disregard for the rights and safety and dignity of Plaintiff's decedent, including failing to provide appropriate medical treatment, failing to keep Mr. Fincham under special watch, failing to contact emergency medical services, and/or failing to transport Mr. Fincham to the hospital emergency department after Mr. Fincham reported that he had ingested one-half gram of fentanyl immediately prior to his incarceration on July 3, 2022; and showed indicators of a severe opioid withdrawal placing Mr. Fincham in a jail cell and leaving him there to suffer until he became unconscious and stopped breathing; standing outside of his jail cell nonchalantly and while he laid motionless and continuing to fail to provide appropriate medical treatment, to contact emergency medical services, and/or to transport Mr. Fincham to the hospital emergency department; and the systematic avoidance of required in-person cell checks. Such conduct violates their statutory duty under N.C.G.S. § 153A-224 to ensure continuous supervision of inmates and "to be at all times informed of the prisoners' general health and emergency medical needs," and pierces the shield of public officer immunity.

## Wellpath, LLC

67. Defendant Wellpath, LLC ("Wellpath") is a professional limited liability company with its principal office in the State of Delaware. According to its website, it provides healthcare services in 110 facilities in more than 60 counties in 7 states, and cares for more than 26,000 residents daily. Wellpath is sued under the doctrine of *respondeat superior* for the acts, omissions, and negligence of its agents, C. Englert, R.N., Tracellar Smith, R.N., Indrea D. Warren, R.N., and Samantha Elliott-McLaren, R.N.

68. At all times relevant to this Complaint, Wellpath had contracted with the Sheriff of Mecklenburg County to provide medical care for persons detained in the Mecklenburg County jail pursuant to a medical care plan submitted to and approved by Mecklenburg County and Sheriff McFadden as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001.

69.    Based on Wellpath's contract to provide medical care to residents at the Mecklenburg County Detention Facility pursuant to a medical plan required by state statute and regulation, Wellpath is a "person" acting under color of law for purposes of 42 U.S.C. § 1983.  It is sued for violating the Fourteenth Amendment rights of the decedent in failing to provide him adequate medical care while he was a  pretrial detainee.

70.    Wellpath is also sued under state law for the wrongful death of decedent by failing to adequately supervise decedent's medical care and allowing Wellpath employees and agents to exceed the scope of their medical licenses, which proximately led to his death.

### C. Englert, R.N.

71.    At all times relevant to this Complaint, Defendant C. Englert, R.N. ("Englert") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services in the Mecklenburg County jail.  Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

72.    Englert is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation.  Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody.  She is sued individually under § 1983.

73.    Further, the actions and omissions of Englert were so outrageous as to shock the conscience of the community and violate Mr. Fincham 's right to substantive due process.

### Samantha Elliott-McLaren, R.N.

74.    At all times relevant to this Complaint, Defendant Samantha Elliott-McLaren R.N. ("Elliott-McLaren") was a licensed registered nurse (RN) who was employed by Wellpath to

provide nursing services in the Mecklenburg County jail. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

75. Elliott-McLaren is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

76. Further, the actions and omissions of Elliott-McLaren were so outrageous as to shock the conscience of the community and violate Mr. Fincham 's right to substantive due process.

**Tracellar Smith, R.N.**

77. At all times relevant to this Complaint, Defendant Tracellar Smith, R.N. ("Smith") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services in the Mecklenburg County jail. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

78. Smith is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

79. Further, the actions and omissions of Smith were so outrageous as to shock the conscience of the community and violate Mr. Fincham 's right to substantive due process.

**Indrea Warren, R.N.**

80. At all times relevant to this Complaint, Defendant Indrea Warren, R.N. ("Warren") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services in the

Mecklenburg County jail. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

81.     Warren is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

82.     Further, the actions and omissions of Warren were so outrageous as to shock the conscience of the community and violate Mr. Fincham 's right to substantive due process.

83.     Defendant Warren is also sued under state law for wrongful death, as she owed a duty of care to Mr. Fincham and violated the standards of medical care applicable to licensed practical nurses, including exceeding the scope of her license by providing inadequate medical care without proper supervision by a licensed physician, and her breach of that standard of care and duty owed proximately caused the death of decedent.

84.     At all times relevant herein, all defendants were acting under color of state law.

## JURISDICTION

85.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

86.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

87.     Under 28 U.S.C. § 1391(b), the venue is proper in the United States District Court for the Western District of North Carolina because all of the events giving rise to this action occurred in the Western District.

## FACTS

### Sheriff McFadden's Policy, Practice, Custom of Deliberate Indifference

88.     On July 6, 2022, Defendant Sheriff McFadden had a policy of deliberate indifference to the safety and medical needs of residents at the Mecklenburg County Detention Center "MCDC."

89.     This policy of deliberate indifference is clear from Defendants Mecklenburg County's and Sheriff McFadden's disregard of the following:

    a.    Non-compliance with minimum standards law requiring detention officers to provide continuous supervision of residents;

    b.    Non-compliance with minimum standards law requiring detention officers to observe each resident when conducting rounds;

    c.    Failure to address the emergency medical needs of residents who are in need of immediate medical assistance;

90.     In violation of the minimum standards law requiring detention officers to conduct rounds on an irregular basis at least twice per hour during which they observe each resident, Mecklenburg County, Sheriff McFadden, C. King, Fleming, and Fetherson routinely would:

    a.    When conducting "rounds," not account for the individual prisoners in their holding pods;

    b.    When conducting "rounds," would merely scan their badges but fail to conduct a satisfactory observation of residents;

    c.    When conducting "rounds," would merely scan their badges but not conduct observations of residents;

    d.    When conducting "rounds," not look into the individual pods to check on the residents who were not in the common area; and

e. When conducting "rounds," touch their badges to the electronic wall sensors indicating they had observed each prisoner while knowing they had not.

91. Mecklenburg County and Sheriff McFadden routinely declined to address the emergency medical needs of residents by:

a. Declining to respond to residents during or immediately after a medical emergency has commenced;

b. When responding to residents after a medical emergency has commenced, declining to treat medical emergencies with urgency; and

c. After finding a resident having a medical emergency, declining to secure emergency medical care from a licensed physician.

92. Mecklenburg County and Sheriff McFadden routinely failed to supervise detention officers for compliance with minimum standards law requiring supervision of residents and provision of emergency medical care.

93. Mecklenburg County and Sheriff McFadden routinely failed to take disciplinary action against detention officers known to have violated minimum standards law requiring supervision of residents and provision of emergency medical care.

94. Mecklenburg County and Sheriff McFadden's lack of supervision and discipline for violations of minimum standards law created a widespread pattern and practice among MCDC staff of deliberate indifference to the safety and medical needs of residents.

95. This pattern and practice of deliberate indifference to the safety and medical needs of residents was so widespread that it served as the unwritten policy by Mecklenburg County and Sheriff McFadden at the MCDC.

96. This pattern and practice of deliberate indifference, which was known to the residents, created an environment in which residents were not only permitted but were encouraged to

supervise, discipline and otherwise govern each other, as noted by the North Carolina Department of Health and Human Services.

97.     This pattern and practice of deliberate indifference by Mecklenburg County and Sheriff McFadden is demonstrated by the fact that seven (7) other residents died within a three (3) year period prior to Mr. Fincham's death due to Mecklenburg County and Sheriff McFadden's failure to supervise and directly observe its residents.

98.     In each case, the Defendants exhibited a blatant disregard for the lives of these decedents, repeatedly failing to provide necessary supervision and intervention, thereby showing a consistent and deliberate indifference to the wellbeing and safety of those under their custody.

99.     This pattern and practice of deliberate indifference is further showcased by the fact that 17 total residents died while in custody at the MCDC from the time Sheriff McFadden assumed office on December 4, 2018 until Mr. Fincham's death on July 6, 2022.

100.    NCDHHS cited Defendant McFadden for a violation of N.C.G.S. 153A-224 due to failing to have custodial staff present to provide continuous supervision and security.  Violation of that statute is a Class 1 misdemeanor.

101.    In its February 2, 2022 inspection report, NCDHHS provided a detailed account of violent incidents at the jail and made note that the Jail was understaffed during each shift for those incidents.

**Michael Trent - Died April 2, 2019**

102.    Michael Trent died on April 2, 2019, he was found unresponsive in his cell at MCDC. He was then taken to Carolinas Medical Center, where he was pronounced dead due to fentanyl intoxication. According to the NCDHHS, prior to his death, MCDC staff failed to adhere to the required twice-hourly observation standard.

103.    Following Michael Trent's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

a.  In the area POD 3100 the general standard of Ongoing two (2) completed tours per hour on an irregular basis will be conducted using as a reference:

  i.  The time clock option on the tour watch system, which allows you to know thirty (30) minutes from the last pod tour conducted. The tours are conducted within thirty (30) minutes, not every thirty (30) minutes.

  ii.  The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

  iii.  The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

b.  Other potential issues were identified that needed to be addressed:

  i.  Random review of electronic pod tours compared with the entries noted in OMS; and

  ii.  Random review of the video recordings within each housing unit to ensure consistency with the written document.

104.    Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the North Carolina Division of Health and Human Services, along with their wrongful

19

acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

### Michael Mangan - Died July 12, 2020

105. Michael Mangan died on July 12, 2020, he was also found unresponsive in his cell at MCDC. According to the autopsy report, Mr. Mangan's cause of death was fentanyl toxicity in the setting of severe cardiovascular disease. According to the NCDHHS, prior to his death, MCDC staff again failed to adhere to the required twice-hourly observation standard.

106. Following Michael Mangan's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

    a. In Pod 3200 the general standard of the (2) two completed tours every one hour on an irregular basis will be conducted using as a reference:

        i. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

        ii. The pod officer, while walking and observing residents, will push each electronic tour button throughout the pod. Physically walking and observing residents twice an hour on an irregular basis not substituted by the electronic tour system.

        iii. The time clock feature on the tour watch system, allows you to know (30) thirty minutes from the last pod tour conducted. Pod tours are conducted within (30) thirty minutes, not every (30) thirty minutes.

    b. Identifying other potential areas:

      i.    Using the measure as listed above, the practice will be applicable to all pods.

107.    Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**Karon Golightly - Died May 14, 2021**

108.    Karon Golightly died on May 14, 2021, after MCDC staff failed to observe Mr. Golightly for 86 minutes leading up to his death.

109.    Following Karon Golighty's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

    a.    In Pod 3700 the general standard of the (2) two completed tours everyone hour on an irregular basis will be conducted using as a reference:

        i.    The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

        ii.    The pod officer, while walking and observing residents, will push each electronic tour button throughout the pod. Physically walking and observing residents twice an hour on an irregular basis is not substituted by the electronic tour system.

   iii. The time clock feature on the tour watch system, allows you to know (30) thirty minutes from the last pod tour conducted. Pod tours are conducted within (30) thirty minutes, not every (30) thirty minutes.

  b. Identifying other potential areas:

   i. Using the measure as listed above, the practice will be applicable to all pods.

110. Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**John Devin Haley - Died May 22, 2021**

111. On May 22, 2021, eight (8) days after Mr. Golightly's death, John Devin Haley was discovered hanging beneath his cell window with a strip of blanket tied around his neck. An investigation by the NCDHHS into Haley's suicide revealed that MCDC staff repeatedly failed to adhere to the required twice-hourly observation standard.

112. Following John Haley's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

  a. In the area POD 6800 the general standard of two (2) completed tours per hour on an irregular basis will be conducted using as a reference:

i.  The time clock option on the tour watch system, which allows you to know thirty (30) minutes from the last pod tour conducted. The tours are conducted within (30) thirty minutes, not every (30) thirty minutes.

ii.  The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

iii.  The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

b.  Identifying other potential areas:

i.  Using the measures as outlined above, the practice will be applicable to all housing units.

ii.  Measurements to ensure accountability:

1.  Shift log entries

2.  Electronic monitoring system

3.  Pod video recordings

c.  Corrective actions:

i.  Random review of electronic pod tours compared with the entries noted in OMC.

ii.  Random review of the video recordings with each housing unit to ensure consistency with the written documents.

113.  Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham.

23

Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**Francine Laney - Died March 2, 2022**

114. On March 2, 2022, Francine Laney was found unresponsive in her cell in the MCDC infirmary. According to the NCDHHS, prior to her death, MCDC staff again failed to adhere to the required twice-hourly observation standard.

115. Following Francine Laney's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

  a. The general standard of (2) two completed tours every hour on an irregular basis will be conducted in the affected area using (10A NCAC 14J .0601 (a) Supervision) as a reference:

   i. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

   ii. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

   iii. The time clock feature on the tour watch system alerts one (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted within the (30) thirty minutes, not every (30) thirty minutes.

24

b.  Identifying other potential areas:

    i.  Using the measures as outlined above, the practice will be applicable to all housing units.

    ii.  Measurements to ensure accountability:

        1.  Shift log entries (OMS)

        2.  Electronic monitoring system

        3.  Pod video recordings

c.  Corrective actions:

    i.  Random review of electronic pod tours compared with the shift log entries noted in Offender Management System (OMS).

    ii.  Random review of the video recordings within each pod to ensure consistency with the written document.

d.  Corrective action dates:

    i.  The corrective actions are ongoing as a facility standard.

e.  Plan of Correction

    i.  In the area of POD 2300, the general standard of (2) two completed tours every hour on an irregular basis will be conducted using a reference:

        1.  Pod officers will initiate the start time and conclusion time.

116.  Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**William Rhinesmith - Died April 19, 2022**

117.    On April 19, 2022, William Rhinesmith was found hanging in his cell. According to the NCDHHS, prior to his death, MCDC staff again failed to adhere to the required twice-hourly observation standard.

    a.  The general standard of (2) two completed tours every hour on an irregular basis will be conducted in the affected area using (10A NCAC 14J .0601 (a) Supervision) as a reference:

        i.  The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

        ii.  The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

        iii.  The time clock will feature on the tour watch system alerts (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted with (30) thirty minutes, not every (30) thirty minutes.

    b.  Identifying other potential areas:

        i.  Using the measures as outlined above, the practice will be applicable to all housing units.

        ii.  Measurements to ensure accountability:

            1.  Shift log entries (OMS)

            2.  Electronic monitoring system

            3.  Pod video recordings

c.  Corrective Actions:

  i.  Random review of electronic pod tours compared with the shift log entries noted in Offender Management System (OMS).

  ii.  Random review of the video recordings within each pod to ensure consistency with the written document.

d.  Corrective action dates:

  i.  The corrective actions are ongoing as a facility standard.

e.  In the area of POD 4200, the general standard of (2) two completed tours every hour on an irregular basis will be conducted using (10A NCAC 14J .0601 (a) Supervision) as a reference.

  i.  POD officers will initiate the start time and conclusion time.

118.   Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**Derrick Geter - Died May 5, 2022**

119.   On May 5, 2022, Derrick Geter suffered from a medical emergency while in the custody of MCDC. Again, the NCDHHS determined that MCDC staff failed to adhere to proper observation requirements.

a.  The general standard of (2) two completed tours every hour on an irregular basis will be conducted in the affected area using (10A NCAC 14J .0601 (a) Supervision) as a reference:

     i.    The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

    ii.    The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute for physically walking and observing residents twice per hour on an irregular basis.

   iii.    The time clock feature on the tour watch system alerts staff (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted twice an hour on an irregular basis, not every (30) thirty minutes.

b. Identifying other potential areas:

     i.    Using the measures as outlined above, the practice will be applicable to all housing units.

c. Measurements to ensure accountability:

     i.    Shift log entries (OMS)

    ii.    Electronic Monitoring system

   iii.    Pod video recordings

d. Corrective actions:

     i.    Random review of electronic pod tours compared with the shift log entries noted in the Offender Management System (OMS).

    ii.    Random review of the video recordings within each pod to ensure consistency with the written document.

e. Corrective action dates:

     i.    The corrective actions are ongoing as a facility standard.

     f.    In the area of POD 2300, the general standard of (2) two completed tours every hour on an irregular basis will be conducted using (10A NCAC 14J .0601 (a) Supervision) as a reference:

         i.    POD officers will initiate the start and end times.

120.    Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

121.    Upon information and belief, Sheriff McFadden vented his frustrations to his staff about their failure to provide him with timely reports regarding issues in the jail. Upon information and belief, Sheriff McFadden stated, "if you really know what all goes on instead of what people telling you, you'll be a little upset too . . .  because when you find out, you don't find out the same day it happened . .  you find out two weeks when it happened, and then **I have to cover it up** . . .  I have to deal with and then I got to say this is what happened y'all . . ."

122.    Defendants' pattern and practice of deliberate indifference to the safety and emergency medical needs of residents caused the death of Russell Fincham IV, on July 6, 2022.

**Russell Fincham's Admission on July 3, 2022**

123.    On July 3, 2022, Mr. Fincham began the process of being booked into the MCDC, after he was arrested for the following charges: (1) Breaking and Entering a Motor Vehicle, (2) Misdemeanor Larceny, (3) Misdemeanor Larceny and (4) Breaking and Entering a Motor Vehicle.

124.    At approximately 11:00 a.m. on July 3, 2022, Mr. Fincham was screened by Wellpath, LLC. The screening sought to assess Mr. Fincham's physical and mental condition, as well as obtain information about Mr. Fincham's behavior prior to his incarceration at MCDC.

125.    Mr. Fincham informed Elliott-Mclaren, R.N. (Wellpath employee), Mecklenburg County and Sheriff McFadden (through his agents) and Wellpath, through its agents, that he was a daily user of fentanyl, and had consumed five (5) Xanax bars and one-half (½) gram of fentanyl on July 3, 2022 prior to his incarceration.

126.    Mr. Fincham reported regular use of opioids and was considered at risk for opioid withdrawal.

127.    Upon information and belief, one-half gram of fentanyl is a lethal dosage of fentanyl for human consumption.

128.    Accordingly, all Defendants were objectively aware of Mr. Fincham's fragile condition because he told them that he had very recently ingested fentanyl, a deadly narcotic.

129.    All Defendants knew screening Mr. Fincham was critical to fully understanding and meeting Mr. Fincham's acute and complex substance withdrawal-related needs.

130.    Mr. Fincham was identified as an individual in need of immediate clinical assessment because he was known to have used alcohol or sedatives recently, regularly, and heavily; in addition, Mr. Fincham's statements about using alcohol or sedatives in the weeks prior to his arrest and also reports a history of complicated withdrawals.

131.    Mr. Fincham screened as positive for substance withdrawal risk.

132.    On July 4, 2022, and thereafter, Mr. Fincham was not in the physical or mental state to consume the prescribed medication.

133. Mr. Fincham was housed in a detoxification housing unit ("pod") under direct observation. Pursuant to the 10A NCAC 14J .0601 Mecklenburg County and Sheriff McFadden were under an obligation to make direct observation of Mr. Fincham twice every hour.

134. Upon information and belief, residents at risk for substance related withdrawals are housed in detoxification pods.

135. Pursuant to the plan of correction adopted by Defendants on June 28, 2022 following the death of Derrick Geter on May 5, 2022, Defendants were required to adhere to 10A NCAC 14J .0601 (a) Supervision as follows:

    a. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

    b. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute for physically walking and observing residents twice per hour on an irregular basis; and

    c. The time clock feature on the tour watch system alerts staff (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted twice an hour on an irregular basis, not every (30) thirty minutes.

136. On July 3, 2022 at approximately 11:00 a.m., all Defendants possessed direct knowledge that Mr. Fincham had ingested a lethal amount of fentanyl.

137. From the time that Mr. Fincham was booked until he died on July 6, 2022 at approximately 8:59 a.m. he was visibly distressed and showed signs of agitation, restlessness, and irritability, and was constantly moving.

**Russell Fincham on July 5, 2022**

138. Throughout July 5, 2022, Mr. Fincham showed signs of pain, agitation, restlessness, and irritability.

139.    Other residents within his pod noticed that he showed signs of pain, agitation, restlessness, and irritability.

140.    On July 5, 2022, between 10:00 a.m. and 2:00 p.m., and between 5:00 p.m. and 7:00 p.m., Defendant Fleming, C. King, Sheriff McFadden and Mecklenburg County failed to complete the required number of direct observations for Mr. Fincham. Specifically, they missed seven mandated direct observations of Mr. Fincham.

141.    Upon information and belief, many of the electronically documented pod tours from July 5, 2022, at 10:00 a.m. until July 6, 2022, at 7:00 a.m. consisted of officers merely pushing the tour buttons to document a tour, rather than physically walking into and observing the residents in Mr. Fincham's pod.

142.    From the evening hours July 5, 2022, until approximately 7:30 a.m., Mr. Fincham repeatedly and continuously vomited a black substance into styrofoam cups, his bed, and a bucket.

143.    In total, Mr. Fincham vomited over two (2) gallons of vomit from the evening hours July 5, 2022, until approximately 7:30 a.m.

**Russell Fincham on July 6, 2022 at 6:00 a.m.**

144.    At approximately 6:00 a.m. on July 6, 2022, Mr. Fincham continued to exhibit signs of distress such as twitching, convulsing and the inability to control his movements.

145.    Fetherson arrived at Mr. Fincham's pod at approximately 7:00 a.m. on July 6, 2022.

146.    Fetherson walked over to Mr. Fincham and looked in his general direction.

147.    At this time, there was a bucket and cup full of black vomit directly next to Mr. Fincham's bed; however, the floor near Mr. Fincham's bed did not contain vomit.

148.    At approximately 7:05 a.m., Mr. Fincham vomited black bile on the floor beside his bed and his breathing became more labored.

149. Fetherson re-entered Mr. Fincham's pod at approximately 7:14 a.m. and walked towards Mr. Fincham and looked in the direction of Mr. Fincham and the black vomit on the floor on at least seven (7) occasions. Also, during this visit to the pod, another resident explained in detail to Fetherson that Mr. Fincham had been vomiting and showing signs of distress since the night before (July 5, 2022). At this time, Fetherson observed over two (2) gallons of black vomit that Mr. Fincham had vomited.

150. Despite learning about Mr. Fincham's condition from the night prior, Fetherson solely focused on and directed residents within Mr. Fincham's pod to sweep the floor and discard trash. Fetherson then exited the pod.

151. At approximately 7:24 a.m., residents within Mr. Fincham's pod began looking at Mr. Fincham with grave concern.

152. At approximately 7:32 a.m., Fetherson re-entered the pod with a broom and dust pan. He then began to sweep areas of the pod, cleaned the pod telephone, and further directed residents of the pod to clean the pod. Residents of Mr. Fincham's pod again expressed their concern about Mr. Fincham's health to Fetherson. Fetherson during this visit to the pod exhibited great nonchalance and indifference for Mr. Fincham's deteriorating condition.

153. Fetherson exited the pod at 7:39 a.m.

154. Fetherson re-entered the pod at approximately 7:48 a.m. He then approached and looked at Mr. Fincham as he stood over him.

155. At 7:50 a.m., a resident within Mr. Fincham's pod then demonstrated to Fetherson how Mr. Fincham would consistently experience wrist drop, or in other words, lose control of his wrist, causing it to seize up without any control.

156. Upon information and belief, wrist drop is usually caused by nerve damage, nerve damage can derive from drug intoxication.

157.   Fetherson then exited the pod at approximately 7:54 a.m. After exiting the pod, Fetherson swept the outside of the pod, again exhibiting no urgency with respect to Mr. Fincham's deteriorating condition.

158.   At 7:55 a.m. Fetherson scanned his badge in an effort to electronically evidence a tour round but did not enter the pod.

159.   At 7:58 a.m., and Fetherson and Englert entered the pod to take Mr. Fincham's vitals. Mr. Fincham exhibited an inability to effectively control his body. Particularly, Mr. Fincham experienced wrist drop in front of Englert and Fetherson. Englert also observed more than two (2) gallons of black vomit near Mr. Fincham's bed.

160.   At 8:01 a.m., Mr. Fincham lost control of his motor functions and his breathing became more laborious in front of Englert and Fetherson.

161.   At 8:04 a.m. Englert and Fetherson exited the pod.

162.   Englert then placed the cuff of a blood pressure meter on Fincham's left arm and attempted to obtain his blood pressure. Mr. Fincham appeared lifeless and in physical distress as Englert obtained a blood pressure reading.

163.   Mr. Fincham simultaneously experienced wrist drop in front of Fetherson and Englert. Englert then attempted to pry Mr. Fincham's hand back to counter the effects of his wrist seizing up.

164.   Englert's attempt to pry back Mr. Fincham's hand evidenced her awareness of the physical manifestations of Mr. Fincham's fentanyl intoxication and opioid withdrawals.

165.   Upon information and belief, Englert exited the pod at 8:04:38 AM and told Crystal Ballard-Smith and Director of Nursing Smith that Mr. Fincham exhibited signs of decompensating with low blood pressure and extreme lethargy.

166. Upon information and belief, Englert never documented Mr. Fincham's vitals and low blood pressure results obtained at 7:58 a.m. on July 6, 2022 in Mr. Fincham's medical chart.

167. Upon information and belief, Wellpath's medical plan with Mecklenburg County, Sheriff McFadden, and MCDC states that Narcan should be administered as soon as possible to individuals who fall into the administration criteria below:

    a.    Known or suspected opiate/opioid overdose;

    b.    Signs of possible opiate/opioid overdose;

            i. Respiratory depression;

            ii. Decreased respiratory rate of <12/min;

            iii. Altered mental status of unknown origin; from mild to unresponsive

            iv. Constricted/pinpoint pupils

            v. Low to normal heart rate; and/or

            vi. low blood pressure.

    c.    Unresponsive with unknown cause

    d.    Pulseless or apneic

168. Accordingly, per Wellpath, Mecklenburg County, and Sheriff McFadden's Policies and Procedures, Narcan should be used in the event of an emergency for at-risk patients or anyone who is suspected of having an opiate/opioid overdose.

169. Upon information and belief, at 8:05:46 due to the apparent physical distress and lifeless nature of Mr. Fincham, another resident of MCDC attempted to check the pulse of Mr. Fincham.

170. At 8:06 a.m. Fetherson re-entered the pod and again observed Mr. Fincham as he experienced wrist drop and breathed heavily.

171. Fetherson causally talked with other residents within the pod and then exited the pod to bring trash bags back into the pod so that the other residents could continue their clean up duty.

172.    At 8:12 a.m. Fetherson closed the door to the pod and remained in the hall outside of the pod. Fetherson was personally and actually aware of Fincham's emergency condition.

173.    Mr. Fincham continued to show signs of discomfort, pain, agitation, restlessness, and irritability.

174.    At 8:20:20 a.m., employees of Wellpath rolled a wheelchair to the outside of Mr. Fincham's pod. Those Wellpath employees then stood outside of Mr. Fincham's pod while casually chatting with Fetherson and other employees of Mecklenburg County and Sheriff McFadden.

175.    Fetherson and Wellpath employees/agents: C. Englert R.N., Tracellar Smith R.N., and Indrea D. Warren R.N., waited until 8:23:10 a.m. to enter Mr. Fincham's pod with the wheelchair.

176.    Mr. Fincham began increasingly struggling for his breath during the nearly three (3) minute period between when the wheelchair was brought to the outside of the glass door of his pod and when Fetherson and the Wellpath employees/agents: C. Englert R.N., Tracellar Smith R.N., and Indrea D. Warren R.N., entered the pod.

177.    At 8:24 a.m. Indrea D. Warren R.N. placed her hand on Mr. Fincham's chest and purportedly noticed that Mr. Fincham was not breathing. Defendants then attempted to enact life saving measures to no avail.

178.    At 8:29 a.m. Wellpath administered Naloxone (Narcan).

179.    Based upon Wellpath, Mecklenburg County, and Sheriff McFadden's policies and procedures, Narcan should have been administered to Mr. Fincham immediately after Englert observed Mr. Fincham's low blood pressure, decompensation and extreme lethargy - particularly considering Englert knew that Mr. Fincham had ingested a lethal amount of fentanyl prior to his incarceration on July 3, 2022 and was suffering from opioid withdrawals.

180.    Mr. Fincham was pronounced dead at 8:56 a.m.

181. At all times relevant herein, Mr. Fincham showed signs of discomfort, pain, agitation, restlessness, and irritability.

182. Moreover, policies and procedures of Wellpath, Mecklenburg County, and Sheriff McFadden mandate that "in emergency situations, patient transfer to an acute care hospital should not be delayed due to lack of provider response or order."

183. Englert and Fetherson unnecessarily delayed seeking Mr. Fincham's transfer to an acute care hospital based on their interactions, observations, and knowledge of Mr. Fincham's condition as follows:

    a. Fetherson became aware that Mr. Fincham vomited two (2) gallons of black vomit when he came in contact with Mr. Fincham at 7:14 am.

    b. Fetherson became aware of Mr. Fincham physical distress at 7:55 am.

    c. Englert noticed that Mr. Fincham vomited two (2) gallons of black vomit at 7:55 am.

    d. Englert personally observed that Mr. Fincham's wrist seized up at 8:00 am.

    e. Englert obtained a low blood pressure reading while noticing Mr. Fincham's extreme lethargy at 8:04 am.

    f. Englert sought provider approval after having concern for Mr. Fincham's condition at approximately 8:10 am.

184. Neither Fetherson, nor C. King, nor Defendant Fleming, nor Wellpath employees/agents: Englert, Smith, Warren, and Elliott-McLaren, who were all present with (or in the vicinity of) Mr. Fincham up until that time, called for emergency medical services or requested authorization from a provider or the director of the jail to immediately transfer Mr. Fincham to the hospital, after Mr. Fincham: was visibly distressed; told Elliott-McLaren that he was a daily user of fentanyl, told Elliott-McLaren that he had consumed five (5) Xanax bars and one-half (½) gram of fentanyl on July 3, 2022 prior to his incarceration; exhibited signs of drop wrist; vomited at least two (2)

gallons of black vomit from the evening of July 5, 2022 until approximately 7:30 a.m. on July 6, 2022; had low blood pressure; exhibited decompensation; and/or extreme lethargy.

185.    From approximately 11:00 a.m. on July 3, 2022, through 8:25 a.m. on July 6, 2022, it was evident to Fetherson, C. King, Fleming, Wellpath, Englert, Smith, and Warren that Mr. Fincham was undergoing a severe reaction to fentanyl intoxication, as well as opioid withdrawals.  They all knew that Mr. Fincham had told Elliott-McLaren that he had taken a lethal amount of Fentanyl on July 3, 2022 prior to his incarceration.

186.    Rather than transporting Mr. Fincham to the hospital or calling for emergency medical services, all Defendants took no action.

187.    Several of the instances that Mr. Fincham was checked on in person, occurred by one of the MCDC detention officers walking by the door and merely glancing into it for a fraction of a second, which was grossly insufficient considering her life-threatening medical condition.

188.    Mr. Fincham's toxicology report indicated Acute Synthetic Fentanyl Toxicity in his blood.

189.    All Defendants failed to monitor for the emergence of opioid withdrawal indicators including but not limited to: muscle aches, nausea, piloerection, sweating, seizures, tremors, vital signs that are outside the normal range, vomiting, muscle rigidity, dilated pupils, incoherent speech, and hypotension.

190.    All Defendants were not alert to any indicators of Mr. Fincham being unwell due to their failure to monitor decedent.

191.    Sheriff McFadden failed to train his Custody staff to make an immediate referral to medical services when they observe potential signs and symptoms of withdrawal, or an individual otherwise appears unwell, and when an individual reports experiencing withdrawal.

192.    Sheriff McFadden failed to provide custody staff with first aid training that included training on giving CPR; managing opioid withdrawal (checking respirations, positioning patient

to avoid aspiration, and administering naloxone); and managing seizures (preventing head trauma, positioning the patient to avoid aspiration) while awaiting emergency medical services (EMS).

### N.C. R. Civ. Pro. 9(j) - Wellpath, LLC Defendants

193. The attorneys representing Plaintiffs object to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this Rule seems to require plaintiffs to prove their case before factual discovery has even begun, that this Rule denies medical malpractice plaintiffs their rights of due process and equal protection under the law, of the right to open courts, and of the right to a jury trial (in violation of both the United States and North Carolina Constitutions). Furthermore, Rule 9(j) is an unconstitutional violation of the following: (a) Amendment VII and Amendment XIV of the United States Constitution; and (b) Article I, Sections 18, 19 and 25 of the North Carolina Constitution. In addition, this complaint also alleges facts establishing breaches of constitutional and common law duties for which certification of compliance with Rule 9(j) are not required. In particular, certain claims in this suit do not allege "medical malpractice by a health care provider ... in failing to comply with the applicable standard of care," but rather, allege claims based on deprivation of constitutional rights and based on the principles of *respondeat superior* and apparent agency. Such claims fall outside the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure and, as such, compliance with Rule 9(j) with respect to these and other claims is not required.

194. Without waiving these objections, the attorneys for Plaintiffs provide information below to comply with the requirements of Rule 9(j) in an abundance of caution. Pursuant to Rule 9(j) of the Rules of Civil Procedure, the toxicology report, autopsy, and investigation report by chief medical examiner that are available to Plaintiffs after reasonable inquiry has/have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify as a forensic pathologist who performed the second autopsy,

should a Court later determine that anyone who has reviewed the autopsy of decedent who does not meet the requirements of Rule 702(b) or 702 (c) of the Rules of Evidence, then Plaintiffs will seek to have such person(s) qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and Plaintiffs move the Court (as provided in Rule 9) of the Rules of Civil Procedure) that such person(s) be qualified as an expert witness.

## FIRST CAUSE OF ACTION
### WRONGFUL DEATH: DEFENDANT MCFADDEN, DEFENDANT MECKLENBURG COUNTY, DEFENDANT FLEMING, DEFENDANT FETHERSON, AND DEFENDANT KING

195. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

196. N.C.G.S. § 153A-224 is a safety statute expressly enacted to protect a pre-trial detainee like Mr. Fincham whose liberty has been taken and who is confined in a local detention facility.

197. The MCDC is a local confinement facility for the purposes of N.C.G.S. § 153A-224.

198. The actions and omissions of Defendant McFadden, Defendant Mecklenburg County, Defendant Fleming, Defendant Fetherson, and Defendant King, including failing to keep Mr. Fincham under a special watch, failing to supervise  failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Mr. Fincham to the hospital emergency department after it was clear that Mr. Fincham was undergoing a severe opioid withdrawal violated their affirmative obligation under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care for Mr. Fincham , as well as state regulations on observing residents and reporting medical concerns.

199. Their breaches of the affirmative duty imposed by a safety statute constituted negligence *per se*.

200.    These breaches of statutory duties imposed by N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care precludes the application of governmental immunity.

201.    As a proximate result of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King negligence, Mr. Fincham suffered agonizing pain and humiliating abandonment, until he died. Mr. Fincham was in the class of citizens that N.C.G.S. § 153A-224 was enacted to protect.

202.    Sheriff McFadden is liable, under the doctrine of *respondeat superior*, both under common law and by statute, for the actions and omissions of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King led to Mr. Fincham 's death.  The Sheriff's duty to operate the county jail in a safe manner is a non-delegable duty under N.C.G.S. § 162-24.

203.    Further, Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King are individually liable.  Some of their actions were taken outside the scope of their authority, including the systematic avoidance of required in-person cell checks. Further, their actions of failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to monitor Mr. Fincham after having identified him at risk for opioid withdrawal during screening all demonstrated malice and willful and wanton and reckless disregard for his safety.

204.    Conduct that exceeds the scope of authority or that shows such malice and willful or wanton or reckless disregard for a pre-trial detainee pierces the shield of public officer immunity.

205.    As a proximate result of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King's malicious, willful, wanton, and reckless conduct, Mr. Fincham suffered agonizing pain and humiliating abandonment, until he died.

206.     Plaintiffs, in their capacities as Co-Administrator's of the Estate, are entitled to recover from Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Mr. Fincham experienced in the time before his death.

207.     Plaintiffs also seek and are entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King showed actual malice toward Mr. Fincham  and willful and wanton and reckless disregard for his safety.

**SECOND CAUSE OF ACTION**
**WRONGFUL DEATH: DEFENDANT WELLPATH, LLC, DEFENDANT C. ENGLERT, R.N., DEFENDANT SAMANTHA ELLIOTT-MCLAREN, R.N., DEFENDANT TRACELLAR SMITH, R.N.,  AND DEFENDANT INDREA WARREN, R.N.**

208.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

209.     Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N.,  And Defendant Indrea Warren, R.N.,  did not comply with the accepted standards of care for her healthcare profession in the same or similar communities at the times of the negligent acts and/or omissions complained of herein.

210.     Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N.,  And Defendant Indrea Warren, R.N.,  are liable and were negligent in at least the following respects:

211.     Failing to provide appropriate medical treatment to Mr. Fincham  and/or failing to contact emergency medical services after Mr. Fincham  was identified as at risk for opioid withdrawal;

212. Failing to provide appropriate medical treatment to Mr. Fincham and/or failing to contact emergency medical services after Mr. Fincham self-reported himself at risk for opioid withdrawal; and

213. Otherwise failing to comply with the accepted standards of care for healthcare professionals in the same or similar communities.

214. As a proximate result of Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., And Defendant Indrea Warren, R.N.'s negligence, Mr. Fincham suffered agonizing pain and humiliating abandonment, until he died.

215. A person of ordinary intelligence and prudence could have foreseen that death would be the probable result of the failure to provide proper medical care to a person who was at risk for opioid withdrawal.

216. Defendant Wellpath is liable, under the doctrine of *respondeat superior*, for the medical negligence of its agents, Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., And Defendant Indrea Warren, R.N, in providing healthcare to Mr. Fincham.

217. Defendant Wellpath also failed to adhere to the medical care plan submitted to and approved by County officials, as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001, because the nursing staff, including Defendant Doe, was not supervised by a licensed physician, exceeding the scope of their licensure and constituting negligent supervision.

218. Plaintiffs, in their capacity as Co-Administrator's of the Estate, are entitled to recover from Defendants Defendant C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N., And Indrea Warren, R.N., and Wellpath, LLC, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Mr. Fincham experienced in time before his death.

219.    Plaintiffs also seek and are entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendants Defendant C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N.,  And Indrea Warren, R.N.,  and Wellpath, LLC, jointly and severally. The actions of Defendants Defendant C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N.,  And Indrea Warren, R.N.,  showed actual malice toward Mr. Fincham  and willful and wanton and reckless disregard for his safety.  Defendants Defendant C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N.,  And Indrea Warren, R.N.,  were the managing agent for Wellpath  in the jail, subjecting Wellpath  to punitive damages.

### THIRD CAUSE OF ACTION
**FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983:**
**DEFENDANT MCFADDEN, DEFENDANT MECKLENBURG COUNTY, DEFENDANT**
**FLEMING, DEFENDANT FETHERSON, AND DEFENDANT KING**

220.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

221.    All Defendants except the Surety are "persons," and their actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

222.    The rights of pre-trial detainees and the conduct of Defendant McFadden, Defendant Mecklenburg County, Defendant Fleming, Defendant Fetherson, And Defendant King are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

223.    The practice in the jail of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care and systematically failing to place medically distressed detainees on a four-times-per-hour direct observation watch as required by North Carolina law [10A NCAC 14J.0601(c)] violated the standard of objective reasonableness.

224.    Defendant McFadden  also failed to train his detention facility officers and other agents, including the Defendants herein, in recognizing and properly responding to pre-trial detainees'

medical needs, posed substantial risk of serious harm, which also violates the standard of objective reasonableness. Defendant McFadden is sued in his official capacity for this Fourteenth Amendment violation.

225. Further, the specific acts and omissions of Defendant Fleming, Defendant Fetherson, and Defendant King complained of herein were objectively unreasonable and violated Mr. Fincham 's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Mr. Fincham to the hospital after he had been identified at a risk for opioid withdrawal.

226. Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference. These included the acts of failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Mr. Fincham to the hospital after he had reported that he been identified at a risk for opioid withdrawal.

227. Further, Mr. Fincham was detained under conditions that posed a substantial risk of serious harm, and Defendant Fleming, Defendant Fetherson, and Defendant King knew of and disregarded those risks to Mr. Fincham 's health and safety, including hearing, seeing, and ignoring indicators of opioid withdrawal, which violated Mr. Fincham 's Fourteenth Amendment rights.

228. Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions complained of herein showed reckless disregard and open contempt for Mr. Fincham's well-being by Defendant Fleming, Defendant Fetherson, and Defendant King, satisfying the deliberate indifference standard.

229. Defendant Fleming, Defendant Fetherson, And Defendant King had actual and constructive knowledge of Mr. Fincham's serious medical condition but were deliberately indifferent to Mr. Fincham 's need for critical and essential assessment and medical treatment.

230. Defendant Fleming, Defendant Fetherson, And Defendant King are sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

231. The actions of these same individual Defendants so violated the standards of decency as to shock the conscience of the community and thus violated Mr. Fincham's right to substantive due process also protected by the Fourteenth Amendment.

232. As a result of these violations by Defendant Fleming, Defendant Fetherson, and Defendant King, Mr. Fincham suffered an agonizing death under inhumane conditions and was left to die in his jail cell.

233. Plaintiff seeks and is entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendant Fleming, Defendant Fetherson, and Defendant King including but not limited to damages for the pain and suffering and humiliation that Mr. Fincham experienced before his death.

234. Plaintiffs also seek and are entitled to punitive damages from Defendant Fleming, Defendant Fetherson, And Defendant King in their individual capacities, as allowed under 42 U.S.C. § 1983, due to their deliberate and reckless indifference to Mr. Fincham 's federally protected rights.

235. Defendant McFadden is also liable as the supervisor and director of the jail, due to the practices at the jail of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care, not properly training the jail's detention officers on how to attend to the urgent medical needs of detainees at risk for opioid withdrawal, and failing to place Mr. Fincham on a four-times-per-hour direct observation watch, as required by law. There was a causal

link between the willful and wanton indifference to these jail processes, guard training, and detainee monitoring deficiencies and Mr. Fincham 's death.

236.    Defendant McFadden  is also liable as the supervisor of Defendants Fleming, Fetherson, and King as he implicitly authorized, approved, or knowingly acquiesced in their deliberate indifference to Mr. Fincham 's federally protected rights.

237.    Upon information and belief, Defendant Fetherson  had the ability to view Mr. Fincham and he knew or should have known of Mr. Fincham's life-threatening medical condition at or near the time he displayed indicators of opioid withdrawal, and he failed to direct any of the Defendants to transport Mr. Fincham to the hospital or to contact emergency medical services in sufficient time to save his life.

**FOURTH CAUSE OF ACTION**
**FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983:**
**DEFENDANT WELLPATH, LLC, DEFENDANT C. ENGLERT, R.N., DEFENDANT**
**SAMANTHA ELLIOTT-MCLAREN, R.N., DEFENDANT TRACELLAR SMITH, R.N.,**
**AND DEFENDANT INDREA WARREN, R.N.,**

238.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

239.    Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N.,  Defendant Indrea Warren, R.N., and Wellpath LLC are "persons," and their actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

240.    The rights of pre-trial detainees and the conduct of Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N.,  Defendant Indrea Warren, R.N., and Wellpath LLC towards Mr. Fincham are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

241. The specific acts and omissions of Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., and Defendant Indrea Warren, R.N., complained of herein, which are imputed to Defendant Wellpath, were objectively unreasonable and violated Mr. Fincham 's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment and failing to contact emergency medical services after Mr. Fincham had reported that he had consumed one-half gram of fentanyl and was and showed signs of a severe opioid withdrawals.

242. Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference. These included Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., Defendant Indrea Warren, R.N.'s acts of failing to provide appropriate medical treatment and failing to contact emergency medical services after Mr. Fincham reported that he had consumed one-half gram of fentanyl and was and showed signs of a severe opioid withdrawals.

243. Further, Mr. Fincham was detained under conditions that posed a substantial risk of serious harm, and Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., and Defendant Indrea Warren, R.N. knew of and disregarded those risks to Mr. Fincham 's health and safety, including hearing, seeing, and ignoring his condition of fentanyl toxicity and opioid withdrawals, which violated Mr. Fincham 's Fourteenth Amendment rights.

244. Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions of Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., and Defendant Indrea Warren, R.N. complained of herein showed reckless disregard and open contempt for Mr. Fincham's well-being, satisfying the deliberate indifference standard.

245. Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., and Defendant Indrea Warren, R.N. had actual knowledge of Mr. Fincham's serious medical condition but was deliberately indifferent to Mr. Fincham's need for critical and essential assessment and medical treatment.

246. Defendants C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N., and Indrea Warren, R.N. are sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

247. The actions of Defendants C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N., and Indrea Warren, R.N., which are imputed to Defendant Wellpath, so violated the standards of decency as to shock the conscience of the community and thus violated substantive due process also protected by the Fourteenth Amendment.

248. As a result of these violations by Defendants C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N., Indrea Warren, R.N. and Wellpath LLC, Mr. Fincham suffered an agonizing death under inhumane conditions.

249. Plaintiffs seek and are entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendants C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N., Indrea Warren, R.N. and Wellpath, including but not limited to damages for the pain and suffering and humiliation that Mr. Fincham experienced in the time before his death.

250. Plaintiffs also seek and are entitled to punitive damages as allowed under 42 U.S.C. § 1983, due to Defendants C. Englert, R.N., Samantha Elliott-McLaren, R.N., Tracellar Smith, R.N., and Indrea Warren, R.N.'s reckless indifference to Mr. Fincham 's federally protected rights.

## FIFTH CAUSE OF ACTION
### ACTION UNDER BOND
### Against Platte River Insurance Company

251.   All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

252.   Upon information and belief, Platte River Insurance held the Bond.

253.   The actions of the individual Mecklenburg County defendants constituted neglect and malfeasance in their employment with Sheriff McFadden and were taken under the suspicious of the office of the Sheriff. As a proximate result, the decedent died.

254.   Further, the negligence described above should be covered by the Bond, as those Defendants were acting under the non-delegable authority of the Sheriff at all times. As a proximate result, decedent died.

255.   Plaintiffs bring this action on the Sheriff's bond pursuant to N.C.G.S. § 58-76-5.

256.   Plaintiffs, in their capacity as Co-Administrators of the Estate, are entitled to recover on the bond all damages for wrongful death caused by the neglect and malfeasance of the Sheriff and his agents, as allowed by N.C.G.S. § 28A-28-2(b). Such damages are in excess of $25,000.00. Plaintiffs may sue repeatedly on the bond until judgment is paid.

**SIXTH CAUSE OF ACTION**
**N.C.G.S. § 162-55**

257.   All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

258.   The actions and omissions of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King showed such reckless indifference and thoughtless disregard for Mr. Fincham 's safety that Plaintiffs are entitled to recover treble the compensatory damages awarded to the Estate from them, pursuant to N.C.G.S. § 162-55. Under the case law, such reckless indifference is equivalent to criminal neglect.

## SEVENTH CAUSE OF ACTION
### N.C.G.S. § 162-50

259.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

260.    The actions and omissions of Defendant Fleming, Defendant Fetherson, and Defendant King, which are imputed to Sheriff McFadden under the principle of *respondeat superior*, constituted willful failure or neglect to perform duties imposed upon them under Chapter 162 of the North Carolina General Statutes, including N.C.G.S. § 162-22 (duty to have "care and custody of the jail") and § 162-55 (duty to not "do, or cause to be done, any wrong or injury to the prisoners committed to his custody, contrary to law"), entitling Plaintiffs to a penalty of five hundred dollars ($500.00) under N.C.G.S. § 162-50, in addition to all other remedies sought herein.

## EIGHTH CAUSE OF ACTION
### Punitive Damages

261.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

262.    Upon information and belief, four other residents died, while residents of the Mecklenburg County Jail within one year prior to Mr. Fincham's death.

263.    Plaintiffs seek punitive damages due to the intentional, reckless, and grossly negligent conduct of the Defendant, which transcends ordinary negligence.

264.    Defendant McFadden's conduct in maintaining unsafe staffing levels and failing to perform mandated safety checks directly caused or contributed to Mr. Fincham's untimely death.

265.    Defendant McFadden's actions were malicious, oppressive, and in reckless disregard of Mr. Fincham's rights, justifying an award of punitive damages.

266.    Specific facts demonstrating the egregious nature of the Defendant's conduct include, but are not limited to, the following:

a. Failure to Perform Safety Checks: In the 32 hours leading up to Mr. Fincham's death, jail officers missed over 25% of the required safety checks, despite the critical need for monitoring residents, particularly those with medical issues.

b. Severe Staffing Shortages: On the day of Mr. Fincham's death, staffing was critically inadequate, with only 8 out of the 17 allocated staff members present on his floor, significantly impairing the ability to perform essential safety checks and respond to emergencies.

c. Pattern of Neglect: Mr. Fincham's death is one of five resident deaths at the Mecklenburg County Jail this year, with the Sheriff's Office cited for missing rounds in four of these cases. This pattern of neglect highlights a systemic disregard for resident safety.

d. State Inspector Warnings: The jail has been under scrutiny for inadequate staffing. A state inspector previously stated that the staffing levels posed an "imminent threat" to resident and staff safety, yet the Defendant failed to take necessary corrective actions.

e. Placement in Medical Pod: Mr. Fincham was placed in a pod primarily housing residents with medical issues, heightening the duty of care owed by the Defendant to ensure his safety and well-being.

f. Conscious Disregard: Despite being aware of the critical importance of safety checks and the dangers posed by inadequate staffing, the Defendant consciously failed to take appropriate measures to protect Mr. Fincham and other residents.

267. The cumulative effect of these actions and omissions reflects a willful and wanton disregard for Mr. Fincham's safety and rights, necessitating punitive damages to punish the Defendant and deter similar conduct in the future.

268. Punitive damages are warranted to hold the Defendant accountable for their egregious conduct and to serve as a deterrent against future violations of resident rights.

## NINTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – <u>Monell</u> Violation
### Custom & Practice in Violation of the Fourteenth Amendment Due
### Process Clause Against Defendant McFadden in his Official Capacity

269.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

270.     Mecklenburg County and Sheriff McFadden was responsible for the formulation and execution of policies regarding the conditions of confinement of pre-trial detainees in MCDC.

271.     At all relevant times, the Mecklenburg County and Sheriff's McFadden was acting under color of state law, had in effect de facto practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of officers and other care providers who worked and/or were contracted at their two respective law enforcement agencies.

272.     The Mecklenburg County Sheriff's Office maintained a custom or practice of failing to follow the direct observation rules, supervision rules, and failing to have adequate staffing at the jail.

273.     This custom or practice is evidenced by some of the examples provided herein. During the years leading up to Mr. Fincham's death, it is believed that at least several deaths were the result of Defendant McFadden's deliberate indifference to the medical needs of residents.

274.     Custodial staff employed by Sheriff McFadden acted in such an overtly reckless manner to suggest that the Mecklenburg County Sheriff's Office – despite the content of written policies – maintained a custom and practice of deliberate indifference.

275.     In the years prior to July 2022, Sheriff McFadden had several jail deaths under his watch that were caused, in part, by a failure of his staff to adequately supervise to the minimal requirements of the set forth by jail standards, failure of his staff to make direct observations of

pre-trial detainees that had a medical condition or injury that posed a substantial risk of serious harm, and failure to ensure his jails were adequately staffed.

276. Upon information and belief, Sheriff McFadden has demonstrated a pattern and practice of deliberate indifference to pre-trial residents' rights. Upon information and belief, in a moment of frustration with his staff over their failure to provide timely reports about issues within the jail, Sheriff McFadden admitted to the challenges and cover-ups he faces. Sheriff McFadden stated:

> "If you really know what all goes on instead of what people telling you, you'll be a little upset too . . . because when you find out, you don't find out the same day it happened . . . you find out two weeks when it happened, and then **I have to cover it up** . . . I have to deal with it and then I got to say this is what happened y'all . . ."

277. Upon information and belief, the above-referenced quote highlights Sheriff McFadden's policies and practices of covering up his office's failures to meet the minimum standards set forth by the State of North Carolina.

278. Sheriff McFadden's actions caused pre-trial detainees to be deprived of their of rights secured by the Constitution which is the same harm suffered by Mr. Fincham.

279. As a direct and proximate result of said practices and customs, Mr. Fincham was denied his rights under the Fourteenth Amendment.

## <u>JURY DEMAND</u>

280. Plaintiffs requests that all issues be tried before a jury of their peers.

WHEREFORE, Plaintiffs, as Co-Administrators of the Estate, upon the trial of this matter before a jury, prays that the Court enter judgment for Plaintiffs and order the following relief:

1. Judgment against Defendant McFadden in his official capacity under principles of *respondeat superior*, and against Defendant Fleming, Defendant Fetherson, and

54

Defendant King individually, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

2. Judgment against Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., Defendant Indrea Warren, R.N. and Defendant Wellpath, LLC jointly and severally, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

3. Judgment against Defendant McFadden in his official capacity, and against Defendant Mecklenburg County, and against Defendant Fleming, Defendant Fetherson, and Defendant King in their individual capacities, under 42 U.S.C. § 1983 for compensatory damages.

4. Judgment against Defendant Fleming, Defendant Fetherson, and Defendant King in their individual capacities under 42 U.S.C. § 1983 for punitive damages.

5. Judgment against Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., Defendant Indrea Warren, R.N. and Defendant Wellpath, LLC jointly and severally, under 42 U.S.C. § 1983 for compensatory damages and punitive damages.

6. An award of treble the compensatory damages against Defendant McFadden, Mecklenburg County, Defendant Fleming, Defendant Fetherson, Defendant King, Defendant C. Englert, R.N., Defendant Samantha Elliott-McLaren, R.N., Defendant Tracellar Smith, R.N., Defendant Indrea Warren, R.N. and Defendant Wellpath, under N.C.G.S. § 162-55.

7. An Order that Defendants pay Plaintiff's costs as allowed under 42 U.S.C. § 1988, including reasonable attorneys' fees.

8. That the Court grant such other and further relief as it deems equitable and just.

Respectfully submitted, this the 8th day of July, 2022.

BY:

*Micheal L. Littlejohn, Jr.*
Micheal L. Littlejohn, Jr. (NCSB: 49353)
**Littlejohn Law, PLLC**
227 W. Fourth Street,
Charlotte, NC, 28202
T: (704) 322-4581
F: (704) 625-9396
mll@littlejohn-law.com

*Ronard Dixon, Jr.*
Ronard Dixon, Jr. (NCSB: 49661)
**Hall and Dixon, PLLC**
725 East Trade Street Suite 115
Charlotte, NC, 28202
T: (704) 993-6825
F: (704) 413-3882
rcdixon@halldixonlaw.com

*M. Anthony Burts II*
M. Anthony Burts II (NCSB: 49878)
**Burts Law, PLLC**
P.O. Box 102
Newton, NC 28658
T: (704) 751-0455
F: (704) 413-3882
anthony@burtslaw.com