UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No.: 3:24-cv-000636

MARY ROBIN AND RUSSELL
FINCHAM III, Co-Administrators of the
Estate of Russell Meade Fincham IV,

      Plaintiffs,

v.

GARRY MCFADDEN, in his official
capacity as Sheriff of Mecklenburg County
and individually; MECKLENBURG
COUNTY; PLATTE RIVER INSURANCE,
as surety for the Sheriff; CORTINA KING,
in her official and individual capacity,
COBIYAN FETHERSON, in his official
and individual capacity, Defendant
CHINAETTA FLEMING, in her official
and individual capacity; WELLPATH, LLC;
CASEY JANE ENGLERT, R.N.;
SAMANTHA ELLIOTT-MCLAREN, R.N.,
TRACELLAR SMITH, R.N., INDREA
WARREN, R.N., DANIEL T. BIONDI,
M.D., LOUIS ELAM HALLMAN and
H.I.G. CAPITAL, LLC,
                    Defendants.

_____/

**PLAINTIFF'S FIRST
<u>AMENDED COMPLAINT</u>
(Jury Trial Demanded)**

      COMES NOW the Plaintiffs, by and through their undersigned counsel, hereby files this

Amended Complaint. This Amended Complaint relates back to the original Complaint, and the

provisions in the original Complaint are incorporated by reference herein. The Plaintiff amends

her original Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B). Plaintiff adds and states the

following:

## NATURE OF THE CASE

1. In Sheriff McFadden's five and a half years as sheriff of Mecklenburg County, there have been eighteen deaths at the detention center. This is yet another lawsuit filed after the tragic loss of Mary Robin and Russell Fincham IV's son, Russell Meade Fincham IV.

2. On July 6, 2022, Russell Fincham, IV, a 25-year-old male who was a pre-trial inmate ("resident") detained in the Mecklenburg County Detention Center ("MCDC"), died of fentanyl toxicity while in the care, custody, and control of Sheriff Garry McFadden and MCDC detention officers, their agents, and their supervisors.

3. Fentanyl is a prescription opioid commonly used as an anesthetic/analgesic. It is reported to be 80 to 200 times as potent as morphine and has a rapid onset of action and addictive properties. Signs associated with fentanyl toxicity include severe respiratory depression, nausea, vomiting, muscle rigidity, seizures, hypotension, coma, and death.

4. Mr. Fincham died as a result of the deliberate actions and failures of Sheriff Garry McFadden, MCDC detention officers charged with the care, custody, and control of Mr. Fincham, and MCDC supervisors charged with the instruction and training of MCDC detention officers. Particularly, (1) Sheriff Garry McFadden and other MCDC supervisors failed to properly supervise and/or train detention officers charged with the supervision of MCDC residents, (2) detention officers, pursuant to the customs and practices of officer conduct at MCDC, failed to conduct direct observations of MCDC residents, specifically those residents like Mr. Fincham who were known to be vulnerable, during required security checks, and (3) detention officers and medical staff failed to provide timely emergency medical care despite clear notice of Mr. Fincham's dire condition as reported by other MCDC residents to on-duty detention officers and displayed by Mr. Fincham's obvious symptoms of opioid toxicity and

2

withdrawal. Mecklenburg County, Sheriff McFadden, and MCDC intentionally delegated its responsibility for medical supervision and arranging emergency medical care of residents to a contractor, Wellpath, LLC ("Wellpath").

5.     Sheriff Garry McFadden's written policies demonstrate an awareness of the significant risk posed to residents, particularly those residents detoxing from prior drug use, if left unattended. These policies alerted detention officers, their supervisors, and contractors to this substantial risk. Further, because residents in the care, custody, and control of Sheriff Garry McFadden and his employees and/or agents at MCDC cannot provide themselves with medical care, these policies also outlined the actions that detention officers were required to take to protect residents and secure emergency medical care when needed.

6.     While Garry McFadden has been Sheriff of Mecklenburg County, at least eight residents of the MCDC have died as a result of MCDC officers failing to follow MCSO's policy regarding the observation of residents. Seven of these deaths occurred prior to Mr. Fincham's. Sheriff McFadden's continued disregard for his agents and/or employees' failure to follow written policy is tantamount to his approval of their actions. As such, Sheriff McFadden has created and approved of a custom of insufficient resident observation. As a result, on July 6, 2022, in view of the control room both through a glass wall and on the security camera monitors, Mr. Fincham, while suffering from fentanyl toxicity, was left in his cell unattended and unsupervised.

7.     Despite being in view of the control room both through a glass wall and on the security camera monitors, detention officers took no action over the course of several hours while Mr. Fincham was suffering from opioid withdrawals.

3

8. Detention officers and medical staff failed to (1) respond to reports made by other MCDC residents of Mr. Fincham's condition, and (2) observe physical indicators of Mr. Fincham's opioid toxicity and withdrawal.

9. Detention officers failed to conduct their mandated rounds, which required officers to conduct timely supervision rounds and visually observe each MCDC resident.

10. Detention officers observed Mr. Fincham's cell only once between the hours of 5 A.M. and 6 A.M. on July 6, 2022. In addition, Detention officers failed to visually observe Mr. Fincham during several supervision rounds that occurred throughout July 5, 2022, and July 6, 2022.

11. Had Defendants observed Mr. Fincham's cell as required or responded to reports from other MCDC residents, the detention officers would have seen that Mr. Fincham was in distress and in dire need of immediate emergency medical attention.

12. Neither the detention officers nor Wellpath employees took appropriate action to timely obtain emergency medical attention for Mr. Fincham.

13. Despite Mr. Fincham's serious condition, the detention officers and Wellpath employees failed to seek emergency medical attention.

14. Had the detention officers and their supervisors acted to secure medical attention for Mr. Fincham's emergency medical needs related to opioid toxicity and withdrawals in a timely manner, Mr. Fincham would not have died of fentanyl toxicity.

15. Plaintiffs bring this action under 42 U.S.C. § 1983 for deliberate indifference to Mr. Fincham's safety and to his emergency medical needs in violation of the Fourteenth Amendment and under North Carolina law for wrongful death.

16.     Plaintiffs are suing the Mecklenburg County Sheriff, whose policies and customs of deliberate indifference resulted in Mr. Fincham's death, and those in the Mecklenburg County Sheriff's Office ("MCSO") and at the MCDC who carried out the policies and customs. Plaintiffs also sue jail medical staff who worked for Wellpath, a contracted medical provider for residents in the care, custody, and control of Sheriff Garry McFadden.

17.     Mary Robin and Russell Fincham IV, individually and as the administrators of the decedent's estate (Mecklenburg County File No. 24-E001950-590), file suit bringing claims under 42 U.S.C. § 1983 against the MCSO, which is responsible for the care, custody, and control of residents in the MCDC, and several employees of the MCSO individually, as well as Wellpath and its employees. Specifically, claims under the Fourteenth Amendment for the detention officer's deliberate indifference to Mr. Fincham's medical needs due to opioid toxicity and withdrawal. The Estate also alleges violations of state law.

18.     The actions and inactions of the defendants were objectively unreasonable in that the Defendants should have known of Mr. Fincham's condition and the risks and failed to act accordingly.

## JURISDICTION AND VENUE

19.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

20.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     Under 28 U.S.C. § 1391(b), the venue is proper in the United States District Court for the Western District of North Carolina because all the events giving rise to this action occurred in the Western District.

5

## PARTIES

### Plaintiffs

22.    Plaintiffs Mary Robin and Russell Fincham III ("Plaintiffs"), citizens and residents of Mecklenburg County, are bringing this action, under 42 U.S.C. § 1983 and state law for acts committed by Defendants under color of state law, in their capacities as the duly-appointed Co-Administrators of the Estate of their deceased son, Russell Meade Fincham IV, who died on July 6, 2022, while in the custody of Defendant Sheriff Garry McFadden and his officers in the MCDC.

23.    Plaintiffs were duly appointed Co-Administrators by the Clerk of Superior Court in Mecklenburg County file no. 24E001950-590.

24.    Plaintiffs are the personal representatives of Mr. Fincham's estate per N.C.G.S. Stat. §§ 28A-18-1, 28A-18-2, 28A-18-3.

### Defendant Sheriff Garry McFadden

25.    On July 6, 2022, Defendant Sheriff Garry McFadden ("McFadden" or "Sheriff McFadden") was the elected Sheriff of Mecklenburg County, charged by statute with control and operation of the MCDC (sometimes, the "jail"). He is sued in his official capacity for both state law and federal law claims.

26.    Sheriff McFadden was elected as Sheriff on December 4, 2018. At all times relevant to this Complaint, Sheriff McFadden had custody of the jail under N.C.G.S. § 162-22, had a non-delegable responsibility for the maintaining of adequate supervision of the jail under N.C.G.S. § 162-24, and was the final policymaker for the jail for purposes of 42 U.S.C. § 1983.

27.    At all times relevant, McFadden acted under color of state law.

28.    Sheriff McFadden's legal obligations include the specific duty under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees in order "to be at all times informed of the prisoners' general health and emergency medical needs." He is sued in his official capacity under N.C.G.S. § 58-76-5 and N.C.G.S. § 153A-435. He is also sued officially as the final policymaker responsible for the unlawful practices at the MCDC. Those practices include the systematic (1) failure to supervise observation rounds, (2) failure to make direct, visual observations of residents, (3) failure to immediately provide emergency medical care to residents in need, and (4) failure to properly staff the jail despite knowing the jail was overpopulated.

29.    Sheriff McFadden and MCSO have a custom of failing to (1) immediately provide arrestees who are in urgent need of medical attention with emergency care and (2) supervise pre-trial detainees in accordance with correctional standards and state laws and regulations. These practices led to Mr. Fincham's death and the deaths of at least seven (7) other residents at the MCDC within the three (3) years immediately preceding Mr. Fincham's death. MCSO practices also include the failure to provide sufficient competency-based training for MCDC officers and other agents and/or employees to ensure the adequate recognition of and proper response to a resident's need for immediate medical intervention due to a substantial risk of serious bodily harm. Those practices, taken under color of state law, were objectively unreasonable and deliberately indifferent and shocking to the conscience, violating Mr. Fincham's Fourteenth Amendment right to due process and were a proximate cause of his death.

30.    MCSO maintained a custom or practice of failing to follow the direct observation rules in which they were required to comply with.

31.     Upon information and belief, Sheriff McFadden was cited on February 25, 2020, inspection for failure to follow the direct observation rules.  An inspector from the North Carolina Department of Health and Human Services ("NCDHHS") found that several cell windows were blocked, making direct observation impossible.

32.     Upon information and belief, MCDC had 6 deaths from 2017-2018, wherein all passed the NCDHHS death inspection.  After Sheriff McFadden was sworn in as Sheriff in December of 2018, MCDC was cited for failures

33.     Upon information and belief, the table below reflects the increase in failed death investigations under Defendant McFadden from 2017 through 2023.

| Year | # Deaths | # Death Inv Failures | Reason for Failures |
|---|---|---|---|
| 2019 | 1 | 1 | Supervision – Missed Rounds |
| 2020 | 3 | 1 | Supervision – Missed Rounds |
| 2021 | 3 | 2 | Supervision – Missed Rounds (all) |
| 2022 | 5 | 4 | Supervision – Missed Rounds (all) |
| 2023 | 3 | 3 | Supervision – Missed Rounds (all) |

34.     Upon information and belief, in 2020, Sheriff McFadden objected to the proposed readoption of jails, local confinement facility rules 10 NCAC 143 regarding supervision rounds, suicide prevention programs, supervision rounds, medical plans, and screening of inmates.

35.     The following  table reflects the number of supervision failures that, upon information and belief, occurred from 2020 through 2023 at MCDC and were discovered during NCDHHS investigations.

8

| Year | # Inspections | # Supervision Failures | Reason for Supervision Failure |
|---|---|---|---|
| 2020 | 1 | 1 | Paper covering windows – Direct Observation violation |
| 2021 | 2 | 1 | Broken security camera |
| 2022 | 5 | 3 | Missed rounds (all) |
| 2023 | 2 | 2 | Missed rounds (all) |

36.     Upon information and belief, Sheriff McFadden was cited for a violation of N.C.G.S. 153A-224 because of his failure to ensure that custodial staff were present to provide continuous supervision and security at MCDC. This failure was reported in NCDHHS's February 2, 2022, inspection.  Violation of the aforementioned statute is a Class 1 misdemeanor.

37.     Upon information and belief, NCDHHS informed Sheriff McFadden that, based on its observations during investigations, MCDC was unsafe. Part of this dangerousness was due to issues with understaffing.

38.     Sheriff McFadden had a non-delegable, affirmative duty under N.C.G.S. § 153A-221 to comply with minimum standards to provide supervision of MCDC residents to protect their safety, security, health and welfare, and to provide medical care to MCDC residents. *See State v. Wilson*, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007).

39.     Upon information and belief, Sheriff McFadden, through Mecklenburg County, has waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify him for any judgment against him or his employees named in this action.

40.     Further, N.C.G.S. § 153A-224 imposes an affirmative statutory duty upon Sheriff McFadden and his MCDC employees to provide continuous custodial supervision of all

9

persons in custody and "to be at all times informed of the [residents'] general health and emergency medical needs." A violation of this mandatory statutory duty to keep each resident "protected" is a misdemeanor and creates an exception to and precludes the application of the doctrine of governmental immunity to the tort claims in this case.

41. Further, N.C.G.S. § 162-55 imposes an affirmative statutory duty upon Sheriff McFadden and his MCDC employees to refrain from "do[ing], or caus[ing] to be done, any wrong or injury to the [residents] committed to his custody, contrary to law." A violation of this mandatory statutory duty is also a misdemeanor and creates an exception to, and precludes application of, the doctrine of governmental immunity to the tort claims in this case.

42. Further, the defense of governmental or sovereign immunity as a defense to Plaintiffs' state law tort claims has been expressly waived, upon information and belief, by Mecklenburg County's adoption of a resolution that deems the creation of its funded reserve to be the same as the purchase of insurance under N.C. Gen. Stat. § 153A-435(a).

**Defendant Mecklenburg County**

43. Defendant Mecklenburg County is a North Carolina county organized and existing under N.C.G.S. § 153A-10. Defendant Mecklenburg County has all the corporate powers set forth in N.C.G.S. § 153A-11, including the power to be sued. Defendant Mecklenburg County is a "unit" and "local government" under N.C.G.S. § 153A-216, et seq.

44. Defendant Mecklenburg County has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail, under N.C.G.S. § 153A-217 and § 153A-218.

45. Defendant Mecklenburg County maintains and operates the MCDC, located at 801 East Fourth Street, Charlotte, NC, 28202.

46. Defendant Mecklenburg County is responsible under N.C.G.S. § 153A-224 for ensuring that MCDC custodial personnel provide continuous supervision to protect residents from harm.

47. Defendant Mecklenburg County is responsible under N.C.G.S. § 153A-225 for developing an adequate medical plan to provide medical care to prisoners at the Mecklenburg County Detention Center, including the medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare. *See Stockton v. Wake County,* 173 F.Supp.3d 292, 303-04 (E.D.N.C. 2016).

48. Defendant Mecklenburg County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the safety of residents due to inadequate supervision, failure to make direct, visual observations of residents, and failure to address the serious medical needs of residents, like Mr. Fincham.

49. Under its authority, Defendant Mecklenburg County operates and manages MCDC. Defendant Mecklenburg County is and was at all relevant times mentioned herein responsible for the actions, inactions, policies, procedures, and practices/customs of Sheriff McFadden and his respective employees and/or agents. Defendant Mecklenburg County has authority to sue and be sued, to purchase and make contracts, to dispose of and resolve legal actions and tort claims, to provide for jails and corrections, and to operate and/or be responsible for county health facilities, such as its jails through contracts, joint ventures or partnerships.

50. MCDC is a governmental department fully funded and overseen by the Defendant Mecklenburg County. As such, Defendant Mecklenburg County is responsible for all deputy training, discipline, hiring, firing, maintaining deputy, and staff records. Defendant

Mecklenburg County is also responsible for taking corrective actions as it affects Sheriff McFadden, MCSO, and MCSO's jails, prisoners, pretrial detainees, deputy officers, and staff.

51. In 2008, Defendant Mecklenburg County entered into a contract with Correct Care Solutions ("CCS"), which was acquired by HIG Capital in 2013, to provide, through its employees; agents; and representatives, care, including medical; dental; and mental health care, to Mecklenburg County's adult and juvenile correctional facilities. Wellpath is owned by the private equity firm H.I.G. Capital and was created in 2018 through a merger of Correct Care Solutions (CCS) and Correctional Medical Group Companies. The contract was later extended multiple times through November 2024; however, Wellpath terminated its services provided to Defendant Mecklenburg County and Defendant McFadden effective May 2024.In this respect, Defendants Wellpath and H.I.G., through their executives, officers, leadership, employees, agents, and representatives, provide a governmental function and stand in the same capacity as Defendant Mecklenburg County in carrying out their duties at the Mecklenburg County correctional facilities, including MCDC. Defendant Mecklenburg County, jointly with Wellpath, was and is responsible for developing joint policies and procedures that affect citing MCDC residents with serious medical needs in custody. Particularly, Defendant Mecklenburg County, jointly with Wellpath, is required to provide policies and procedures for the continuity of care from the time a resident is booked until he or she is released. Defendant Mecklenburg County was and is responsible for overseeing Wellpath staff members comply with contractual medical responsibilities.

52. Upon information and belief, by obtaining liability insurance and/or participating in a governmental risk pool or contractually requiring its agents to purchase liability insurance

and name Mecklenburg County as an additional insured, the County, on its own behalf as well as on behalf of its agents, has waived governmental and sovereign immunity.

53. Upon information and belief, Sheriff Garry McFadden and Mecklenburg County are self-insured up to $1,500,000.00.

54. Upon information and belief, Defendant Mecklenburg County is the named insured under a public officials' liability policy with Safety Specialty Insurance Company, policy number SPO6675343.

55. Upon information and belief, Mecklenburg County is the named insured under a law enforcement liability policy with Safety Specialty Insurance Company, policy number SLE6675342.

56. Upon information and belief, Mecklenburg County is the named insured under an excess liability policy with Safety National Insurance Company, policy number XPE4058929.

57. Upon information and belief, Mecklenburg County has a Law Enforcement Liability insurance policy with Safety Specialty Insurance Company up to $2,000,000.00 per occurrence, providing coverage for Plaintiff's claims against Defendants Fetherson, Fleming, and King.

58. Upon information and belief, Mecklenburg County pays a premium in the amount of $98,095 for a Law Enforcement Liability insurance policy with Safety Specialty Insurance Company.

59. Upon information and belief, Defendant Mecklenburg County has a Public Officials and Employment Practices Liability insurance policy with Safety Specialty Insurance Company up to $2,000,000.00 per occurrence, providing coverage for Plaintiff's *Monell* claims against Defendants Mecklenburg County and Defendant Sheriff McFadden set forth herein.

60. Upon information and belief, Defendant Mecklenburg County pays a premium in the amount of $144,632 for Public Officials and Employment Practices Liability insurance policy with Safety Specialty Insurance Company.

61. Upon information and belief, Defendant Mecklenburg County has an Excess Liability insurance policy with Safety National Insurance Company up to $3,000,000.00 per occurrence, providing coverage for Plaintiff's claims in excess of the self-insured retention and law enforcement liability policy.

62. Upon information and belief, Mecklenburg County pays a premium in the amount of $129,282 for an Excess Liability insurance policy with Safety National Insurance Company.

63. Upon information and belief, the contract between the MCSO and Defendant Wellpath was pre-audited in a manner required by the Local Government Budget and Fiscal Contract Act by Sarah Cunningham, Mecklenburg County Finance Director.

64. Upon information and belief, Safety Specialty may settle any Claim or Suit both within or in excess of the Self-Insured Retention.

65. Defendant Mecklenburg County has knowingly maintained and tolerated longstanding and systemic deficiencies in MCDC's provision of emergency treatment to seriously ill residents. It has also knowingly had inadequate medical and mental health staffing as well as policies and procedures that were likely in violation of an existing court order directing minimum standards of medical treatment at MCDC. Defendants Sheriff McFadden and Tracellar Smith were aware of and tolerated these serious deficiencies in MCDC's medical care system, policies, and procedures.

**Defendant Platte River Insurance**

66. Defendant Platte River Insurance is a Nebraska company and sued as the Sheriff's surety under N.C.G.S. § 58-76-5.

67. Upon information and belief, Platte River Insurance issued the statutorily mandated surety bond to Mecklenburg County Sheriff McFadden in July 2022, pursuant to N.C.G.S. § 58-76.

68. On July 6, 2022, Sheriff McFadden was obligated under state law to obtain and maintain said surety bond and by doing so, waived sovereign immunity as to the claims in this matter, at least to the extent of the bond.

69. Plaintiffs sue Platte River Insurance Company to recover on the Sheriff's bonds, respectively, for the neglect and/or malfeasance of Sheriff McFadden and his agents and/or employees whose actions and inactions proximately caused Mr. Fincham's death.

**Defendant Chinaetta Fleming**

70. Upon information and belief, Defendant Chinaetta Fleming (hereinafter, "Fleming") was employed by Sheriff McFadden as a detention officer and was on duty at MCDC on the evening of July 5, 2022, until the early morning of July 6, 2022.

71. Upon information and belief, Defendant Fleming is currently a resident of Mecklenburg County, North Carolina.

72. Upon information and belief, Sheriff McFadden assigned Defendant Fleming supervisory responsibility at MCDC and either made her a "keeper" of the MCDC under N.C.G.S. § 162-22 or identified her under N.C.G.S. § 162-24 to assist Sheriff McFadden in operating the MCDC.

73. Defendant Fleming is sued in her individual capacity with regard to any federal-law claims naming her as Defendant.

74. Defendant Fleming is sued in her individual and official capacities with regard to any state-law claims naming her as Defendant.

75. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Fleming.

76. While Defendant Fleming was on duty at MCDC from July 5, 2022, to July 6, 2022, she failed to keep continuous custodial supervision of Mr. Fincham and failed to keep Mr. Fincham under special watch despite her knowledge that he was detoxing from prior drug use, Defendant Fleming's actions caused the death of Mr. Fincham.

### Defendant Cobiyan Fetherson

77. Defendant Cobiyan Fetherson (hereinafter, "Fetherson") was employed by Sheriff McFadden as a Detention Officer and was on duty as a supervisor at MCDC on July 6, 2022.

78. Defendant Fetherson is currently a resident of Mecklenburg County, North Carolina.

79. Upon information and belief, Sheriff McFadden assigned Defendant Fetherson supervisory responsibility at MCDC and either made him a "keeper" of MCDC under N.C.G.S. § 162-22 or identified him under N.C.G.S. § 162-24 to assist Sheriff McFadden in operating the MCDC.

80. Defendant Fetherson is sued in his individual capacity with regard to any federal-law claims naming him as Defendant.

81. Defendant Fetherson is sued in his individual and official capacities with regard to any state-law claims naming him as Defendant.

82. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Fetherson.

**Defendant Cortina King**

83. Defendant Cortina King (hereinafter, "King") was employed by Sheriff McFadden as a Detention Officer and was on duty at the MCDC on the morning of July 6, 2022. She is currently a resident of Mecklenburg County, North Carolina.

84. Upon information and belief, Sheriff McFadden assigned Defendant King supervisory responsibility at MCDC and either made her a "keeper" of MCDC under N.C.G.S. § 162-22 or identified her under N.C.G.S. § 162-24 to assist Sheriff McFadden in operating the MCDC.

85. Defendant King is sued in her individual capacity with regard to any federal-law claims naming her as Defendant. She is sued in her individual and official capacities with regard to any state-law claims naming her as Defendant.

86. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant King.

87. To the extent Defendants Fetherson, King and/or Fleming assert public officer immunity, they are sued individually for conduct outside the scope of their authority and for malicious, willful, and wanton disregard for the rights, safety, and dignity of Plaintiffs' decedent. Their actions include (1) failing to provide appropriate medical treatment despite knowledge of Mr. Fincham's dire condition; (2) failing to keep Mr. Fincham under special watch despite knowledge of his dire condition; (3) failing to contact emergency medical services despite knowledge of Mr. Fincham's dire condition; (4) failing to transport Mr.

Fincham to the hospital emergency department after Mr. Fincham reported that he had ingested one-half gram of fentanyl immediately prior to his incarceration on July 3, 2022; (5) failing to provide appropriate medical treatment, contact emergency services, and/or transport Mr. Fincham to the hospital emergency department after Mr. Fincham exhibited obvious symptoms of severe opioid toxicity and withdrawal; (6) failing to provide appropriate medical treatment, contact emergency services, and/or transport Mr. Fincham to the hospital emergency department after other MCDC residents reported Mr. Fincham's dire condition; and/or (7) failing to conduct in-person cell checks as required, such that Mr. Fincham was left to suffer until he became severely dehydrated, unconscious, and eventually stopped breathing. Such conduct violates their statutory duty under N.C.G.S. § 153A-224 to ensure continuous supervision of inmates and "to be at all times informed of the [residents'] general health and emergency medical needs," and pierces the shield of public officer immunity.

### H.I.G.'s Ownership, Management Partnership, and Control of WELLPATH,

88.     Wellpath, is the largest prison health contractor in the country, serving around 300,000 patients in at least 34 states.

89.     Wellpath is owned by the private equity firm H.I.G. Capital, LLC (hereinafter, "H.I.G.") and was created in 2018 through a merger of Correct Care Solutions (CCS) with Correctional Medical Group Companies.[1]

---

[1] The Atlantic, "The Private Option," Marsha McLeod, September 12, 2019, https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/; Private Equity Stakeholder Project, "HIG Capital's and Wellpath's Correctional Healthcare Investment Risks," June 2019, p. 1, https://pestakeholder.org/wp-content/uploads/2019/06/HIG-Capitals-Correctional-Healthcare-Investment-Risks-PESP-062519.pdf.

90. Wellpath's predecessor CCS was named as a defendant in roughly 1,400 federal lawsuits over the decade leading up to the merger.[2]

91. At all material times, Wellpath was and is owned and controlled by H.I.G. Capital, LLC. Wellpath acts on behalf of H.I.G. Capital, LLC and was and is responsible for the hiring, retaining, training, and supervising of the conduct, policies, and practices of its employees and agents of Wellpath.

92. Upon information and belief, H.I.G. Capital, LLC ("H.I.G.") is a private equity firm doing business in North Carolina county jails.

93. H.I.G. is the owner, manager, and partner of Wellpath, which is employed to provide delivery of medical services to inmates and was and is responsible for the management, hiring, retaining, training, and supervising of the conduct, policies and practices, customs, standards, finances, of its employees, managers, supervisors, contractors, leaders in the service of providing medical care to prisoners, including prisoners such as Mr. Fincham at MCDC.

94. Wellpath executives, directors, supervisors and managers, physicians, nurses, providers, and mental health providers act on behalf of H.I.G. and Wellpath.

95. H.I.G. is the alter ego of Wellpath, and/or alternatively Wellpath acts on behalf of H.I.G. who has control over them.

96. H.I.G. accomplishes this inter alia by placing its in-house professionals and experts as board members of Wellpath to ensure their control over Wellpath. There is unity of interest and ownership such that the separate personalities of H.I.G. and Wellpath no longer exist as

---

[2] Private Equity Stakeholder Project, "HIG Capital's and Wellpath's Correctional Healthcare Investment Risks," June 2019, p. 1, https://pestakeholder.org/wp-content/uploads/2019/06/HIG-Capitals-Correctional-Healthcare-Investment-Risks-PESP-062519.pdf; Project On Government Oversight, "List of Federal Lawsuits Filed Against Correct Care Solutions and Companies It Has Acquired," October 26, 2018, https://www.documentcloud.org/documents/5018937-FINAL-Master-List-of-1395-CCS-Cases-4848-9407-7557.js.

Wellpath and their employees and agents act with the consent, management, approval, ratification, and direction of H.I.G.

97. Upon information and belief, H.I.G. places at least two Managing Directors and one Principal of its private equity team as Board members, Chief Financial Officers, or other executive officers of Wellpath to ensure continuity of control and management over Wellpath.

98. H.I.G. employees are routinely appointed to Wellpath's Board of Directors to ensure financial control over its affairs. Additionally, they have knowledge of H.I.G.'s contractual relationship with Wellpath, and how H.I.G. employees are appointed to Wellpath's board of directors and the duties of its board members.

99. H.I.G. uses the corporate entity as a shield against personal liability and harm caused to those suffering from fentanyl toxicity, overdoses, and the mental health issues in jails.

100. Recognition of H.I.G. as a separate corporate entity would promote injustice and defeat the rights and equities of persons such as Mr. Fincham and Plaintiffs. It would (1) enable and facilitate Wellpath and H.I.G.'s continued unconstitutional conduct, practices, customs, policies, actions, and inactions that harm particularly vulnerable jail populations and (2) discourage abatement of these unconstitutional actions and inactions.

101. Medical care providers, employees, and agents (such as H.I.G. and the companies it owns and controls, including Wellpath), employed by a government entity are state actors for 42 U.S.C. § 1983 purposes. They act under color of state law when providing and delivering medical services to prisoners, including residents of MCDC, and/or implementing policies and practices regarding provision of medical care that directly affect the day-to-day delivery of health care to prisoners and pretrial detainees.

102. Private managers, executives, managers, owners, directors, board members, supervisors, (such as H.I.G.) employed to direct the delivery of medical care to prisoners are state actors acting under color of state law for purposes of § 1983.

103. At all material times, each of H.I.G. and Wellpath's supervisors, managers, and/or executives were responsible for the hiring, retaining, training, and supervising of the conduct, customs, policies, and practices of the members, employees, and agents of H.I.G and Wellpath.

104. Wellpath (owned by H.I.G.), on information and belief with approval of H.I.G., entered into a contract with Defendant Mecklenburg County in 2008 to provide medical and mental health services to those incarcerated and at MCDC.

105. Wellpath, formerly known as Correct Care Solutions until a merger, has been working at MCDC since 2008.

106. Since 2008, Wellpath (owned by H.I.G.), has been providing medical services for Defendant Mecklenburg County's jails. Defendant Mecklenburg County renewed the contract for services, on information and belief with the approval of H.I.G., for Wellpath to provide for medical, mental health, and dental services of those incarcerated in Mecklenburg County's jails. The existing contract between Defendants Mecklenburg County, Sheriff McFadden and Wellpath, that on information and belief, were entered into with the express approval of H.I.G., currently runs through November 2024.

107. Plaintiffs allege that Defendants Englert, Elliot-McLaren, Smith, and Warren (collectively "Nursing Defendants"), were and are acting on behalf of Defendant H.I.G. and were and are agents of H.I.G. Therefore, H.I.G. is responsible for their conduct as described in this Complaint. On information and belief, H.I.G. gave Nursing Defendants authority to act on its behalf and thus, Wellpath and the individual Nursing Defendants were and are H.I.G.'s

agents. Each defendant was, and is, the agent of the other and at all relevant times was acting as the agent and on behalf of the other.

108. H.I.G. exercises sufficient control over Wellpath's activities such that Wellpath is a mere agent or instrumentality of H.I.G.

109. Wellpath undertakes their provision of jail medical and mental health services with the understanding that H.I.G. is the principal in control of those activities. H.I.G. has authorized and in fact encouraged Wellpath to conduct activities in a manner that contains costs and jeopardizes the lives of individuals who are suffering from opioid withdrawals and who have mental illnesses. H.I.G. has or should have knowledge of all material facts regarding Wellpath's actions.

110. H.I.G. ratifies the conduct of Wellpath by knowingly accepting the risks of jail medical services and mental health services. Despite knowledge of the unconstitutional actions and inactions causing harm to sick and/or mentally ill individuals who are incarcerated or detained prior to trial within the City of Charlotte and Mecklenburg County, Wellpath has been H.I.G.'s twenty-third control investment in healthcare since 2008 and is its fourteenth current platform in the sector.

111. Defendant Louis Elam Hallman, CEO (hereinafter "Kip Hallman"), is and at all times herein mentioned was an employee and/or agent of H.I.G. acting on behalf of H.I.G. and Wellpath, and is the Executive Officer for Wellpath.

112. Upon information and belief, Kip Hallman is a resident of the State of Tennessee, and at all times relevant herein was an employee and/or agent of H.I.G. acting on behalf of H.I.G. CFMG, and Wellpath, and the executive officer for CFMG now known as Wellpath.

113. Defendant Kip Hallman is currently Co-Chairman of the Wellpath Board of Directors. He has previously served as the President of Wellpath since 2018. Defendant Kip Hallman has served in other leadership roles at Wellpath for 11 years.

114. Kip Hallman was President of Wellpath until February 2023, at which time Wellpath was under the ownership, supervision, management, and direction of H.I.G. Kip Hallman had and has the duty and responsibility for managing and overseeing all Wellpath medical delivery operations, including those at the MCDC. Kip Hallman is and was responsible for promulgation of policies, procedures, practices, and customs which required and/or allowed H.I.G., Wellpath, and their agents and/or employees to act or fail to act as alleged herein. At all times mentioned herein, Defendant Kip Hallman was acting under color of state law. Defendant Hallman is sued in his individual and official capacities for damages.

### Wellpath, LLC

115. Defendant Wellpath is a professional limited liability company with its principal office in the State of Delaware. According to its website, it provides healthcare services in 110 facilities in more than 60 counties and 7 states. Defendant Wellpath cares for more than 26,000 residents daily. Wellpath is sued under the doctrine of *respondeat superior* for the acts, omissions, and negligence of its agents, Casey Jane Englert, R.N., Tracellar Smith, R.N., Indrea D. Warren, R.N., and Samantha Elliott-McLaren, R.N.

116. Since its creation, Wellpath has been the target of multiple federal investigations and lawsuits, and the company has faced growing public scrutiny.[3]

---

[3] Reuters, "DOJ report exposes failures of jail reform measures," Hassan Kanu, September 9, 2021, https://www.reuters.com/legal/government/doj-report-exposes-failures-jail-reform-measures-2021-09-09/; Prison Legal News, "Wellpath Founder and CEO Pleads Guilty to Federal Bribery Charges," March 1, 2022, https://www.prisonlegalnews.org/news/2022/mar/1/Wellpath-founder-and-ceo-pleads-guilty-federal-bribery-

117. A host of federal investigations, press reports, and reports by incarcerated people have revealed apparent deficiencies in Wellpath's care. Some of the most serious complaints against Wellpath include delayed care and denial of care.

118. Reports indicate that Wellpath routinely fails to provide time-sensitive medical care or denies care outright. For example, a 2021 Department of Justice (DOJ) investigation into Wellpath's medical services at a California jail revealed significant delays in care and blanket denials of medical attention for incarcerated individuals scheduled to be released within weeks or months of the request for care.[4]

119. Similarly, a Department of Homeland Security (DHS) investigation into Wellpath's predecessor, CCS, found that detainees lacked "timely access to proper medical care."[5]

120. Further reports indicate that Wellpath staff have even failed to respond to urgent care needs, including for patients going into labor, seeking to terminate a 15-week pregnancy, requiring an emergency room transfer, or suffering from an emergency drug withdrawal.[6]

---

charges; San Francisco Chronicle, "Its patients are 'literally a captive market.' Is this California health care giant failing them?," Susie Neilson, July 25, 2023, https://www.sfchronicle.com/california/article/Wellpath-health-care-jails- 17917489.php; U.S. Department of Justice, Civil Rights Division, "Notice Regarding Investigation of the Hampton Roads Regional Jail," December 19, 2018, https://s3.documentcloud.org/documents/5978540/Hampton-Roads-DOJ- report.pdf; Daily Press, "Hampton Roads Regional Jail, medical provider settle with family in wrongful death case," Peter Dujardin, November 21, 2018, https://www.dailypress.com/2018/11/21/hampton-roads-regional-jail-medical- provider-settle-with-family-in-wrongful-death-case/.

[4] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, pp. 6, 13-14, https://www.justice.gov/opa/press-release/file/1429076/download? utm_medium=email&utm_source=govdelivery

[5] U.S. Department of Homeland Security, Office of Inspector General, "Management Alert –Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California," September 27, 2018, https://s3.documentcloud.org/documents/5978703/2018-OIG-Adelanto-Report.pdf.

[6] CNN, "CNN Investigates: 'Please help me before it's too late,'" Blake Ellis and Melanie Hicken, June 25, 2019, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Declaration Of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 8, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023); Prison Legal News, "$2.45 Million Paid by Wellpath and Macomb County, Michigan, After Detainee's Withdrawal Death in Jail," September 30, 2022, https://www.prisonlegalnews.org/news/2022/sep/30/245-million-paid-Wellpath-and-macomb-county-michigan-after- detainees-withdrawal-death-jail/.

121. Reports suggest that Wellpath has failed to meet contractually required staffing levels and hires under-qualified medical professionals. For example, a 2021 DOJ investigation found that Wellpath staffed an inadequate number of medical professionals at one of its facilities, putting incarcerated individuals at "substantial risk of serious harm."[7]

122. There are reports of Wellpath employing licensed vocational nurses in roles that require registered nurses with more advanced training.[8]

123. There are also reports of Wellpath staff not following the company's own protocols. For example, at some facilities, Wellpath staff have, in violation of company policies, reportedly failed to: perform mortality reviews; notify a physician when patients showed abnormal vital signs; develop individual treatment plans for patients with mental illnesses; and assign different staff members to review an initial grievance and an appeal.[9]

124. Additionally, contrary to Wellpath's policies, some staff have failed to monitor for attempts at self-harm or suicide,[10] and some have even falsified logs by stating that they performed welfare checks.[11] Wellpath has also reportedly failed to abide by its own plan for implementing a court-approved settlement agreement, including failing to timely respond to

---

[7] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, pp. 14-16, https://www.justice.gov/opa/press-release/file/1429076/download? utm_medium=email&utm_source=govdelivery.

[8] The Lens, "Orleans jail monitors disclose for first time issues found under Hutson's leadership," Nick Chrastil, May 16, 2023, https://thelensnola.org/2023/05/16/orleans-jail-monitors-find-falsified-records-understaffing-at-facility/.

[9] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 7, 19, 27, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023); U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 8, https://www.justice.gov/opa/press-release/file/1429076/download? utm_medium=email&utm_source=govdelivery.

[10] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 23, https://www.justice.gov/opa/press-release/file/1429076/download? utm_medium=email&utm_source=govdelivery.

[11] NOLA, "Lackluster Care From Orleans Jail Health Provider Causes 'Serious Harm,' Monitors Say," Joseph Cranney, May 15, 2023, https://www.nola.com/news/crime_police/care-from-orleans-jail-health-provider-causes-serious-harm/article_9a3b7dca-f36d-11ed-aaa9-f7c0e64a05be.html.

sick call requests, refer incarcerated patients to outside providers as needed, or even schedule internal quality improvement meetings.[12]

125. Wellpath's payment structure incentivizes cutting costs by minimizing the number of healthcare services provided and opting to provide less resource-intensive services.[13] In its state and local contracts, Wellpath is typically paid a set rate based on the average daily population at the facilities where it provides care, with caps on the total amount that it can be compensated.[14] While some contracts increase Wellpath's compensation for emergency services such as ambulance runs or decrease compensation for failures such as not triaging sick call requests, pay generally does not increase with the volume, quality, or complexity of

---

[12] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 7, 19, 27, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023); Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan at 10-11, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Sept. 26, 2023).

[13] tps://www.governing.com/archive/gov-prison-health-care.html; NYTimes, "Prisons Cut Costs By Managed Care," Melody Petersen, December 26, 1996, https://www.nytimes.com/1996/12/26/nyregion/prisons-cut-costs-by-managed-care.html; New York University Law Review, "Mismanaged Care: Exploring The Costs And Benefits Of Private Vs. Public Healthcare In Correctional Facilities," Micaela Gelman, November 2020, p. 1404-05, 1414, https://www.nyulawreview.org/wp-content/uploads/2020/11/NYULawReview-Volume-95-Issue-5-Gelman.pdf.

[14] Wellpath, "2021 Corporate Social Responsibility Report," 2022, p. 6, https://Wellpathcare.com/wp-content/uploads/2022/09/2022-09-09-Wellpath-2021-Corporate-Responsibility- Report.pdf; Contract between Alameda County Sheriff's Office and California Forensic Medical Group (now Wellpath LLC), July 2022, [On file with the Office of Senator Elizabeth Warren]; County of Santa Barbara, "Attachment A: Agreement for Services of Independent Contractor, September 12, 2023, p. 3, https://santabarbara.legistar.com/LegislationDetail.aspx?ID=6341487&GUID=1E597D78-6FD6-48F6-8B9D-E8B49147A057; County of Santa Barbara, "Attachment F: Second Amendment to Agreement for Services of Independent Contractor," August 18, 2020, p. 1, 4, https://santabarbara.legistar.com/LegislationDetail.aspx?ID=6341487&GUID=1E597D78-6FD6-48F6-8B9D-E8B49147A057; County of Monterey, "Attachment B - CFMG Agreement with Previous Board Orders," p. 45, https://monterey.legistar.com/LegislationDetail.aspx?ID=5148003&GUID=D8AD9820-4D18-43F1-93B3-9698F17D092D&Options=&Search=.

medical services provided.[15] Some Wellpath contracts also appear to incentivize the company to reduce the number of transfers to hospitals[16] or to employ fewer staff members.[17]

126.    Additionally, contrary to Wellpath's policies, some staff have failed to monitor for attempts at self-harm or suicide, and some have even falsified logs by stating that they performed welfare checks.[18]At all times relevant to this Complaint, Wellpath had contracted with Defendants Sheriff McFadden and Mecklenburg County to provide medical care for persons detained in MCDC pursuant to a medical care plan submitted to and approved by Mecklenburg County and Sheriff McFadden as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001.

127.    Based on Wellpath's contract to provide medical care to residents at MCDC pursuant to a medical plan required by state statute and regulation, Wellpath is a "person" acting under color of state law for purposes of 42 U.S.C. § 1983.  It is sued for violating the Fourteenth Amendment rights of the decedent in failing to provide him with adequate medical care while he was a pretrial detainee.

---

[15] See, e.g., Contract Between the Department of Correction and Wellpath LLC (Formerly Known as Correct Care Solutions LLC) for Comprehensive Health Services to Massachusetts Prison Population, Nineteenth Amendment, February 2023, https://drive.google.com/file/d/1Pvn0v1KdQrX2vStQtklLuezLxkAKDg3_/view; Alameda County Sheriff's Office and California Forensic Medical Group (now WELLPATH LLC), "Exhibit B: Payment Terms," July 2022, p. 55, [On file with the Office of Senator Elizabeth Warren]; County of Monterey, "Amendment No. 3 to Agreement A-13814 Between the County of Monterey and California Forensic Medical Group, Inc." (now Wellpath LLC), December 2022, p. 3, [On file with the Office of Senator Elizabeth Warren].
[16] The New Yorker, "The Jail Health-Care Crisis," Steve Coll, February 25, 2019, https://www.newyorker.com/magazine/2019/03/04/the-jail-health-care-crisis.
[17] U.S. Department of Justice, Office of Inspector General, "Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas to Operate the Reeves County Detention Center I/II Pecos, Texas," April 2015, p. 8, https://oig.justice.gov/reports/2015/a1515.pdf.
[18] NOLA, "Lackluster Care From Orleans Jail Health Provider Causes 'Serious Harm,' Monitors Say," Joseph Cranney, May 15, 2023, https://www.nola.com/news/crime_police/care-from-orleans-jail-health-provider-causes-serious-harm/article_9a3b7dca-f36d-11ed-aaa9-f7c0e64a05be.html.

27

128. Wellpath is also sued under state law for the wrongful death of decedent by failing to adequately supervise decedent's medical care and allowing Wellpath employees and agents to exceed the scope of their medical licenses, which proximately led to his death.

129. In a letter dated January 19, 2024, Wellpath notified Defendants Mecklenburg County and Sheriff McFadden that it will no longer provide health care at MCDC.

130. Wellpath filed for termination on January 19, 2024, but was contracted to provide services to the jail through November 2024.

131. Wellpath terminated the contracted after three people died at the jail between December 14, 2023, and January 20, 2024.

132. Wellpath has serviced MCDC since 2008, including the addition of a widely lauded behavioral health unit in 2019. The current contract began in 2020 and was extended for another two years in 2022.

133. That 2022 extension agreed to reduce the hours of one role and lower the qualifications needed for two other medical roles to increase the overall compensation for the company.

134. Wellpath's contract with Mecklenburg County terminated May 2024.

135. There have been at least eight deaths at MCDC with similar circumstances: Michael Trent in 2019; Michael Mangan in 2020; Karon Golightly and John Devin Haley in 2021; Francine Laney, William Rhinesmith, Russell Fincham and Derrick Geter in 2022.

136. As the company and its past iterations worked in North Carolina jails, some notable accusations followed it. In 2014, Jennifer Schuler, a pregnant inmate at the Forsyth County jail, died after a severe cardiac event and a lack of oxygen to her brain, according to a lawsuit filed there. "After persisting in a vegetative state for five days, Decedent's parents had no option other than to take her off life support," the complaint from Schuler's estate said. Correct

28

Care Solutions — which would merge to become Wellpath — failed to ensure that she got the medications she needed, recognize the significance in her symptoms, and "report adverse changes in her physical condition to physician staff" so she could get better care or be transferred somewhere, it alleged. Correct Care fought the suit for more than a year before Schuler's estate dismissed all the claims in 2017 and 2018. They settled, the Winston-Salem Journal reported.

137. In 2017, Michele Smiley died at Buncombe County's jail after she swallowed methamphetamine. An autopsy found she died from methamphetamine toxicity. Correctional Medical Group, another company that would merge to become Wellpath, reached a confidential settlement and Buncombe County settled for two million dollars.

138. In 2019, yet another Forsyth inmate, John Neville, had asthma and needed an inhaler, according to a federal lawsuit filed by his estate. He missed at least two doses, fell in his cell and "exhibited seizure-like symptoms" on his first night in custody, the suit says. Deputies also drew attention in Neville's case when body camera footage revealed that they put him in a prone position even as he went through the health episode. He died at a hospital days later. An autopsy report listed his cause of death as a lack of oxygen that led to a heart attack and brain injury from being held in prone restraint. While admitting no fault, the county settled with Neville's estate for $3 million. Wellpath settled with Neville's estate and the claims against Wellpath were dismissed.

### Daniel T. Biondi, M.D.

139. Upon information and belief, defendant Daniel T. Biondi, MD ("Dr. Biondi") is, and was at all times relevant herein, a physician duly licensed under the laws of the State of North Carolina and a health care provider practicing in his profession within Mecklenburg County,

North Carolina, as an agent and employee of Mecklenburg County and/or Sheriff McFadden. Dr. Biondi is being sued in his individual capacity and official capacity. At all relevant times herein, Dr. Biondi was the Medical Director of MCDC, Wellpath, and H.I.G. As such, Dr. Biondi was charged with (1) the supervision of the nurses in the MCDC, Wellpath, and H.I.G., including, but not limited to, the Nursing Defendants, and (2) the care, custody, and safekeeping of MCDC residents. Dr. Biondi was a keeper of the MCDC, pursuant to N.C. Gen. Stat.§ 162-55, and was an agent and employee of Sheriff McFadden or, in the alternative, Mecklenburg County. Upon information and belief, Dr. Biondi did not form a physician patient relationship with Russell Fincham the time period of July 3, 2022, to July 6, 2022. Thus, Plaintiffs claims against Dr. Biondi herein do not constitute a medical malpractice claim, pursuant to N.C. Gen. Stat. § 90-21.11.

### Casey Jane Englert, R.N.

140. At all times relevant to this Complaint, Defendant Casey Jane Englert, R.N. ("Englert") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services at MCDC. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

141. Englert is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in MCDC pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

142. Further, the actions and omissions of Englert were so outrageous as to shock the conscience of the community and violate Mr. Fincham's right to substantive due process.

### Samantha Elliott-McLaren, R.N.

143. At all times relevant to this Complaint, Defendant Samantha Elliott-McLaren R.N. ("Elliott-McLaren") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services at MCDC. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

144. Elliott-McLaren is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

145. Further, the actions and omissions of Elliott-McLaren were so outrageous as to shock the conscience of the community and violate Mr. Fincham's right to substantive due process.

### Tracellar Smith, R.N.

146. At all times relevant to this Complaint, Defendant Tracellar Smith, R.N. ("Smith") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services in the Mecklenburg County jail. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

147. Smith is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

148. Further, the actions and omissions of Smith were so outrageous as to shock the conscience of the community and violate Mr. Fincham's right to substantive due process.

149. Upon information and belief, Defendant Smith was the director of nursing at MCDC at the time of Russell Fincham's death.

150. Upon information and belief, Wellpath provided training materials to Defendant Smith regarding the Supreme Court decision that identified the "standard of care" for health care in correctional facilities. Those materials state that deliberate indifference means the denial, delay, or interference with providing care for an inmate's serious medical needs. The Wellpath training materials provided to Defendant Smith defined "deliberate" to mean "carefully considered or intentional." The materials defined "indifference" to mean "lack of concern or interest."

151. Upon information and belief, Wellpath trained Defendant Smith, as the Director of Nursing, that deliberate indifference suggests that Wellpath staff knowingly ignored serious medical needs and put the patient at risk. MCDC residents cannot go elsewhere for care, so medical staff working with MCDC cannot deny them care or refuse to see them. Medical staff, behavioral health staff, dental staff, and correctional staff are held to this standard.

152. Upon information and belief, based on Wellpath's Director of Nursing Resource Guide, Defendant Smith knew the following are considered serious medical conditions: (1) conditions that cause loss of life or limb; (2) conditions that cause significant negative impact on Activities of Daily Living ("ADLs"); (3) conditions that cause significant pain or suffering; and (4) conditions that will lead to one of the above-listed items.

153. Upon information and belief, due to Wellpath's Director of Nursing Resource Guide, Defendant Smith knew that a court could make a finding of deliberate indifference based on

the following: (1) the patient has a serious medical need; (2) the defendant knew that the patient had a serious medical need; (3) delayed care created harm to the patient; (4) the harm was caused by the defendant's indifference; and (5) the failure to treat resulted in further damage to the patient's health or unnecessary infliction of additional pain.

### Indrea Warren, R.N.

154. At all times relevant to this Complaint, Defendant Indrea Warren, R.N. ("Warren") was a licensed registered nurse (RN) who was employed by Wellpath to provide nursing services in MCDC. Upon information and belief, she is currently a resident of Mecklenburg County, North Carolina.

155. Warren is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Mecklenburg County Detention Facility pursuant to state law and regulation. Her actions and omissions violated Mr. Fincham's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

156. Further, the actions and omissions of Warren were so outrageous as to shock the conscience of the community and violate Mr. Fincham's right to substantive due process.

157. At all times relevant herein, all defendants were acting under color of state law.

### WAIVER OF IMMUNITY

158. Defendant Mecklenburg County and Defendant McFadden have waived governmental immunity (agree to be sued) by engaging in a proprietary activity, purchasing liability insurance, and entering into a valid contract.

159.    Upon information and belief, Defendants Mecklenburg County and Sheriff Garry McFadden maintained, at all times relevant to this Complaint, liability insurance affording coverage to this action.

160.    Upon information and belief, Defendant McFadden entered into a valid contract for Patient/Resident Health Care Services with Wellpath thereby waiving immunity as to actions on the contract.

161.    Upon information and belief, Defendant McFadden has waived immunity for engaging in proprietary function of providing professional medical care, which includes without limitation, a comprehensive health evaluation of each MCDC Resident in accordance with NCCHC standards, regularly scheduled sick calls, nursing care, regular physician and dentist visits within MCDC, emergency medical care, vision care, mental health care, medical records management, pharmacy services management, and all necessary administrative support services required for Wellpath to fulfill its obligations under the Agreement. Defendant McFadden is liable for the harms caused by a proprietary activity

## FACTS

### Sheriff McFadden's Policy, Practice, and Custom of Deliberate Indifference

162.    On July 6, 2022, Defendant Sheriff McFadden had a policy of deliberate indifference to the safety and medical needs of residents at MCDC.

163.    This policy of deliberate indifference is clear from Defendant Mecklenburg County's and Defendant McFadden's disregard of the following:

    a.    Non-compliance with minimum standards law requiring detention officers to provide continuous supervision of residents;

b. Non-compliance with minimum standards law requiring detention officers to observe each resident when conducting rounds;

c. Failure to address the emergency medical needs of residents who are in need of immediate medical assistance;

164. In violation of the minimum standards law requiring detention officers to conduct rounds on an irregular basis at least twice per hour during which they observe each resident, Mecklenburg County, Sheriff McFadden, King, Fleming, and Fetherson routinely would:

a. When conducting "rounds," not account for the individual prisoners in their holding pods;

b. When conducting "rounds," would merely scan their badges but fail to conduct a satisfactory observation of residents;

c. When conducting "rounds," would merely scan their badges but not conduct observations of residents;

d. When conducting "rounds," not look into the individual pods to check on the residents who were not in the common area; and

e. When conducting "rounds," touch their badges to the electronic wall sensors indicating that they had observed each resident while knowing they had not actually done so.

165. Mecklenburg County and Sheriff McFadden routinely declined to address the emergency medical needs of residents by:

a. Declining to respond to residents during or immediately after a medical emergency has commenced;

b. When responding to residents after a medical emergency has commenced, declining to treat medical emergencies with urgency; and

c. After finding a resident having a medical emergency, declining to secure emergency medical care from a licensed physician.

166. Defendants Mecklenburg County and Sheriff McFadden routinely failed to supervise detention officers for compliance with minimum standards law requiring supervision of residents and provision of emergency medical care.

167. Mecklenburg County and Sheriff McFadden routinely failed to take disciplinary action against detention officers known to have violated minimum standards law requiring supervision of residents and provision of emergency medical care.

168. Mecklenburg County and Sheriff McFadden's lack of supervision and discipline for violations of minimum standards law created a widespread pattern and practice among MCDC staff of deliberate indifference to the safety and medical needs of residents.

169. This pattern and practice of deliberate indifference to the safety and medical needs of residents was so widespread that it served as the unwritten policy and custom of Mecklenburg County and Sheriff McFadden at the MCDC.

170. This pattern and practice of deliberate indifference, which was known to the residents, created an environment in which residents were not only permitted but were encouraged to supervise, discipline, and otherwise govern each other, as noted by the North Carolina Department of Health and Human Services.

171. This pattern and practice of deliberate indifference by Mecklenburg County and Sheriff McFadden is demonstrated by the fact that seven (7) other residents died within a

three (3) year period prior to Mr. Fincham's death due to Mecklenburg County and Sheriff McFadden's failure to supervise and directly observe its residents.

172.    In each case, the Defendants exhibited a blatant disregard for the lives of these decedents, repeatedly failing to provide necessary supervision and intervention, thereby showing a consistent and deliberate indifference to the wellbeing and safety of those in their care, custody, and control.

173.    This pattern and practice of deliberate indifference is further showcased by the fact that 17 total residents died while in custody at the MCDC from the time Sheriff McFadden assumed office on December 4, 2018, until Mr. Fincham's death on July 6, 2022.

174.    NCDHHS has previously cited Defendant McFadden for a violation of N.C.G.S. 153A-224 because he failed to have custodial staff present to provide continuous supervision and security at MCDC.  Violation of the aforementioned statute is a Class 1 misdemeanor.

175.    In its February 2, 2022, inspection report, NCDHHS provided a detailed account of violent incidents at the jail and made note that the Jail was understaffed during each shift for those incidents.

**Michael Trent - Died April 2, 2019**

176.    Michael Trent died on April 2, 2019. After he was found unresponsive in his cell at MCDC, he was taken to Carolinas Medical Center, where he was pronounced dead due to fentanyl toxicity. According to the NCDHHS, prior to his death, MCDC staff failed to adhere to the required twice-hourly observation standard.

177.    Following Michael Trent's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

a. In the area POD 3100, the general standard of Ongoing two (2) completed tours per hour on an irregular basis will be conducted using as a reference:

    i. The time clock option on the tour watch system, which allows you to know thirty (30) minutes from the last pod tour conducted. The tours are conducted within thirty (30) minutes, not every thirty (30) minutes.

    ii. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

    iii. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

b. Other potential issues were identified that needed to be addressed:

    i. Random review of electronic pod tours compared with the entries noted in OMS; and

    ii. Random review of the video recordings within each housing unit to ensure consistency with the written document.

178. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**Michael Mangan - Died July 12, 2020**

179.    Michael Mangan died on July 12, 2020. He was also found unresponsive in his cell at MCDC. According to the autopsy report, Mr. Mangan's cause of death was fentanyl toxicity in the setting of severe cardiovascular disease. According to the NCDHHS, prior to his death, MCDC staff again failed to adhere to the required twice-hourly observation standard.

180.    Following Michael Mangan's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

   a. In Pod 3200 the general standard of the (2) two completed tours every one hour on an irregular basis will be conducted using as a reference:

      i. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

      ii. The pod officer, while walking and observing residents, will push each electronic tour button throughout the pod. Physically walking and observing residents twice an hour on an irregular basis is not substituted by the electronic tour system.

      iii. The time clock feature on the tour watch system allows you to know (30) thirty minutes from the last pod tour conducted. Pod tours are conducted within (30) thirty minutes, not every (30) thirty minutes.

   b. Identifying other potential areas:

      i. Using the measure as listed above, the practice will be applicable to all pods.

181. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**Karon Golightly - Died May 14, 2021**

182. Karon Golightly died on May 14, 2021, after MCDC staff failed to observe Mr. Golightly for 86 minutes leading up to his death.

183. Following Karon Golightly's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

    a. In Pod 3700 the general standard of the (2) two completed tours everyone hour on an irregular basis will be conducted using as a reference:

        i. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

        ii. The pod officer, while walking and observing residents, will push each electronic tour button throughout the pod. Physically walking and observing residents twice an hour on an irregular basis is not substituted by the electronic tour system.

           iii.    The time clock feature on the tour watch system allows you to know (30) thirty minutes from the last pod tour conducted. Pod tours are conducted within (30) thirty minutes, not every (30) thirty minutes.

     b.  Identifying other potential areas:

          i.    Using the measure as listed above, the practice will be applicable to all pods.

184. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

185. The problems with missed safety checks at MCDC came to public light after the death of a 20-year-old resident Karon Golightly.[19]

186. According to a state review, an officer checked on Golightly after noticing another resident standing by the cell. That was at least 48 minutes since the last check. In the 24 hours leading up Golightly's death, officers missed nearly one-fifth of required safety checks.

187. Upon information and belief, Defendant McFadden responded by alleging that it wasn't that officers missed a lot of safety checks; many safety checks were just late.[20] Particularly, Defendant McFadden stated the following: "The deficiency is we didn't do it in the time frame

---

[19] https://www.wfae.org/crime-justice/2022-08-08/state-review-shows-mecklenburg-jail-continues-to-miss-many-safety-checks
[20] https://www.wfae.org/crime-justice/2022-08-08/state-review-shows-mecklenburg-jail-continues-to-miss-many-safety-checks

that we usually do. Here's an example. Domino's Pizza say they will deliver any pizza in 30 minutes. Is it a deficiency of them coming in 40 minutes? Yes. Was the pizza delivered? Yes."[21] In contradiction with Sheriff McFadden's claims, the state reviews cited missed rounds.

### John Devin Haley - Died May 22, 2021

188.    On May 22, 2021, eight (8) days after Mr. Golightly's death, John Devin Haley was discovered hanging beneath his cell window with a strip of blanket tied around his neck. An investigation by the NCDHHS into Haley's suicide revealed that MCDC staff repeatedly failed to adhere to the required twice-hourly observation standard.

189.    Following John Haley's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

      a.  In the area POD 6800 the general standard of two (2) completed tours per hour on an irregular basis will be conducted using as a reference:

        i.   The time clock option on the tour watch system, which allows you to know thirty (30) minutes from the last pod tour conducted. The tours are conducted within (30) thirty minutes, not every (30) thirty minutes.

        ii.  The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

---

[21] *Id.*

   iii. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

  b. Identifying other potential areas:

   i. Using the measures as outlined above, the practice will be applicable to all housing units.

   ii. Measurements to ensure accountability:

    1. Shift log entries

    2. Electronic monitoring system

    3. Pod video recordings

  c. Corrective actions:

   i. Random review of electronic pod tours compared with the entries noted in OMC.

   ii. Random review of the video recordings with each housing unit to ensure consistency with the written documents.

190. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

191.   Upon information and belief, a state inspection in late June shows officers continue to miss a substantial amount of checks. The state inspector wrote there were "missed rounds at most locations at various times" on two selected days in June. The state inspector's review included three checkpoints where officers missed between 20 to 30 percent of checks. At one point, there were at least two hours in which officers made no checks. [22]

**Francine Laney - Died March 2, 2022**

192.   On March 2, 2022, Francine Laney was found unresponsive in her cell in the MCDC infirmary. According to the NCDHHS, prior to her death, MCDC staff again failed to adhere to the required twice-hourly observation standard.

193.   Following Francine Laney's death, the Health and Service Regulation Division of the NCDHHS ordered that Mecklenburg County and Sheriff McFadden implement the following corrective procedures:

  a.   The general standard of (2) two completed tours every hour on an irregular basis will be conducted in the affected area using (10A NCAC 14J .0601 (a) Supervision) as a reference:

   i.   The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

   ii.   The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour

---

[22] *Id.*

system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

    iii. The time clock feature on the tour watch system alerts one (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted within the (30) thirty minutes, not every (30) thirty minutes.

b. Identifying other potential areas:

    i. Using the measures as outlined above, the practice will be applicable to all housing units.

    ii. Measurements to ensure accountability:

        1. Shift log entries (OMS)

        2. Electronic monitoring system

        3. Pod video recordings

c. Corrective actions:

    i. Random review of electronic pod tours compared with the shift log entries noted in Offender Management System (OMS).

    ii. Random review of the video recordings within each pod to ensure consistency with the written document.

d. Corrective action dates:

    i. The corrective actions are ongoing as a facility standard.

e. Plan of Correction

    i. In the area of POD 2300, the general standard of (2) two completed tours every hour on an irregular basis will be conducted using a reference:

Case 3:24-cv-00636-FDW-SCR   Document 34   Filed 09/17/24   Page 45 of 101

1. Pod officers will initiate the start time and conclusion time.

194. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

195. Upon information and belief, in March, Defendant McFadden told Mecklenburg County commissioners that, unlike other inspections, the state inspector was tipped off to look at certain dates from someone on the sheriff's staff. He also said that although officers did not make the rounds, they weren't far from residents.[23] Specifically, Sheriff McFadden stated the following: "Although they are inside a pod, they simply said with all that's going on, I simply didn't touch a button to indicate that I was making a round. That would be a deficiency. So that's what we're going to talk about moving forward."

### William Rhinesmith - Died April 19, 2022

196. On April 19, 2022, William Rhinesmith was found hanging in his cell.

197. Upon information and belief, a mental health referral dated April 16, 2022. Rhinesmith was placed on suicide watch beginning on April 17, 2022. He was removed Rhinesmith from suicide watch on April 18, 2022. A Collaborative safety plan was implemented that same day, and a 24-hour post watch began on April 19, 2022.

---

[23] https://www.wfae.org/crime-justice/2022-08-08/state-review-shows-mecklenburg-jail-continues-to-miss-many-safety-checks

198. Upon information and belief, Rhinesmith was charged with possession of a stolen vehicle four days earlier before his death. In the 36 hours surrounding his death, officers missed nearly one-fifth of mandated safety checks. Officers missed about the same amount of checks in the hours preceding Francine Laney's death, including one right before she was found in distress.

199. According to the NCDHHS, prior to Rhinesmith's death, MCDC staff again failed to adhere to the required twice-hourly observation standard.

    a. The general standard of (2) two completed tours every hour on an irregular basis will be conducted in the affected area using (10A NCAC 14J .0601 (a) Supervision) as a reference:

        i. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

        ii. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute method for physically walking and observing residents twice per hour on an irregular basis.

        iii. The time clock will feature on the tour watch system alerts (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted with (30) thirty minutes, not every (30) thirty minutes.

    b. Identifying other potential areas:

        i. Using the measures as outlined above, the practice will be applicable to all housing units.

   ii. Measurements to ensure accountability:

    1. Shift log entries (OMS)

    2. Electronic monitoring system

    3. Pod video recordings

  c. Corrective Actions:

   i. Random review of electronic pod tours compared with the shift log entries noted in Offender Management System (OMS).

   ii. Random review of the video recordings within each pod to ensure consistency with the written document.

  d. Corrective action dates:

   i. The corrective actions are ongoing as a facility standard.

  e. In the area of POD 4200, the general standard of (2) two completed tours every hour on an irregular basis will be conducted using (10A NCAC 14J .0601 (a) Supervision) as a reference.

   i. POD officers will initiate the start time and conclusion time.

200. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

**Derrick Geter - Died May 5, 2022**

201. On May 5, 2022, Derrick Geter suffered from a medical emergency while in the custody of MCDC. Again, the NCDHHS determined that MCDC staff failed to adhere to proper observation requirements.

    a. The general standard of (2) two completed tours every hour on an irregular basis will be conducted in the affected area using (10A NCAC 14J .0601 (a) Supervision) as a reference:

        i. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

        ii. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute for physically walking and observing residents twice per hour on an irregular basis.

        iii. The time clock feature on the tour watch system alerts staff (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted twice an hour on an irregular basis, not every (30) thirty minutes.

    b. Identifying other potential areas:

        i. Using the measures as outlined above, the practice will be applicable to all housing units.

    c. Measurements to ensure accountability:

        i. Shift log entries (OMS)

        ii. Electronic Monitoring system

   iii. Pod video recordings

  d. Corrective actions:

   i. Random review of electronic pod tours compared with the shift log entries noted in the Offender Management System (OMS).

   ii. Random review of the video recordings within each pod to ensure consistency with the written document.

  e. Corrective action dates:

   i. The corrective actions are ongoing as a facility standard.

  f. In the area of POD 2300, the general standard of (2) two completed tours every hour on an irregular basis will be conducted using (10A NCAC 14J .0601 (a) Supervision) as a reference:

   i. POD officers will initiate the start and end times.

202. Defendants Mecklenburg County and Sheriff McFadden failed to fully comply with the corrective actions outlined in the above paragraph and its subparts regarding the death of Mr. Fincham. Furthermore, their failure to adhere to the notice of deficiencies at the MCDC and the directives issued by the NCDHHS, along with their wrongful acts concerning Mr. Fincham, as described herein, demonstrate a pattern, policy, and custom of deliberate indifference to Mr. Fincham's safety and need for emergency medical care.

203. Upon information and belief, Sheriff McFadden vented his frustrations to his staff about their failure to provide him with timely reports regarding issues in MCDC. Upon information and belief, Sheriff McFadden stated, "if you really know what all goes on instead of what people telling you, you'll be a little upset too . . . because when you find out, you don't find

out the same day it happened . . . you find out two weeks when it happened, and then I have to cover it up . . . I have to deal with and then I got to say this is what happened y'all . . . ."

204. Defendants' pattern and practice of deliberate indifference to the safety and emergency medical needs of residents caused the death of Russell Fincham IV, on July 6, 2022.

**Russell Fincham's Admission on July 3, 2022**

205. On July 3, 2022, Mr. Fincham began the process of being booked into the MCDC, after he was arrested for the following charges: (1) Breaking and Entering a Motor Vehicle, (2) Misdemeanor Larceny, (3) Misdemeanor Larceny, and (4) Breaking and Entering a Motor Vehicle.

206. At approximately 11:00 A.M. on July 3, 2022, Mr. Fincham was screened by the agents and/or employees of Wellpath, LLC. The screening sought to assess Mr. Fincham's physical and mental condition, as well as obtain information about Mr. Fincham's behavior prior to his incarceration at MCDC.

207. Mr. Fincham informed Elliott-McLaren, R.N. (Wellpath employee), Mecklenburg County and Sheriff McFadden (through his agents) and Wellpath, through their agents and/or employees, that he was a daily user of fentanyl, and had consumed five (5) Xanax bars and one-half (½) gram of fentanyl on July 3, 2022, prior to his incarceration.

208. Mr. Fincham reported regular use of opioids and was considered at risk for opioid withdrawal.

209. Upon information and belief, one-half gram of fentanyl is a lethal dosage of fentanyl for human consumption.

210. Accordingly, all Defendants were objectively aware of Mr. Fincham's fragile condition because he told them that he had very recently ingested fentanyl, a deadly narcotic.

211. All Defendants knew screening Mr. Fincham was critical to fully understanding and meeting Mr. Fincham's acute and complex substance withdrawal-related needs.

212. Mr. Fincham was identified as an individual in need of immediate clinical assessment because he was known to have used opioids recently, regularly, and heavily. In addition, Mr. Fincham reported that he used opioids in the weeks prior to his arrest and had a history of complicated withdrawals.

213. Mr. Fincham was prescribed the following by Wellpath's agents and/or employees: chlordiazepoxide, folic acid, thiamine HCL, and Meclizine. These prescription drugs were to be administered beginning on July 3, 2022, for multiple days in order to help Mr. Fincham detox.

214. All Defendants failed to administer the initial doses of medication on July 3, 2022.

215. Mr. Fincham screened as positive for substance withdrawal risk.

216. On July 4, 2022, and thereafter, Mr. Fincham was not in the physical or mental state to consume the prescribed medication.

217. Mr. Fincham was housed in a detoxification housing unit ("pod") under direct observation. Pursuant to 10A NCAC 14J .0601, Defendants Mecklenburg County and Sheriff McFadden were obligated to directly observe Mr. Fincham twice every hour.

218. Upon information and belief, residents at risk for substance related withdrawals are housed in detoxification pods.

219. Pursuant to the plan of correction adopted by Sheriff McFadden on June 28, 2022, following the death of Derrick Geter on May 5, 2022, Defendants were required to adhere to 10A NCAC 14J .0601 (a) Supervision as follows:

a. The pod officer will initiate the start time and conclude with an ending time noted on the shift log using the Offender Management System (OMS).

b. The pod officer, while walking and observing residents, will push all electronic tour buttons throughout the housing unit. The electronic tour system is not a substitute for physically walking and observing residents twice per hour on an irregular basis; and

c. The time clock feature on the tour watch system alerts staff (30) thirty minutes after the last pod tour was conducted. Pod tours are conducted twice an hour on an irregular basis, not every (30) thirty minutes.

220. On July 3, 2022, at approximately 11:00 A.M., all Defendants possessed direct knowledge that Mr. Fincham had ingested a lethal amount of fentanyl.

221. From the time that Mr. Fincham was booked until he died on July 6, 2022, at approximately 8:59 A.M., he was visibly distressed, showed signs of agitation; restlessness; and irritability, and was constantly moving in a manner that indicated pain.

**Russell Fincham on July 5, 2022**

222. Throughout July 5, 2022, Mr. Fincham showed signs of pain, agitation, restlessness, and irritability.

223. Other residents within his pod noticed that he showed signs of pain, agitation, restlessness, and irritability.

224. On July 5, 2022, between 10:00 A.M. and 2:00 P.M., and between 5:00 P.M. and 7:00 P.M., Defendant Fleming failed to complete the required number of direct observations for Mr. Fincham. Specifically, she missed more than seven mandated direct observations of Mr. Fincham.

225. Upon information and belief, many of the electronically documented pod tours from July 5, 2022, at 10:00 A.M. until July 6, 2022, at 7:00 A.M. consisted of Fleming merely pushing the tour buttons to document a tour, rather than physically walking into and observing the residents in Mr. Fincham's pod.

226. Fleming worked for MCSO from October 2020 to July 2021, then returned on January 26, 2022. Despite her limited prior experience, Fleming was responsible for supervising the observation pod that housed Mr. Fincham on July 5, 2022. This was her first night working in an observation pod.

227. Following Mr. Fincham's death, Fleming told investigators from the State Bureau of Investigation ("SBI") that during her brief training for her new observation duties, she (Fleming) was told by Sheriff McFadden and/or his employees and/or agents that she did not need to physically enter the pod to complete her observations. She was further told that merely looking through the window was sufficient.

228. This inadequate training directly contributed to Fleming's failure to properly monitor and respond to Mr. Fincham's medical emergency.

229. Prior to her shift on July 5, 2022, Fleming was told that Mr. Fincham was in the observation pod because he was detoxing from prior drug use.

230. Fleming told SBI investigators that on or around the time she began her shift on July 5, 2022, she (Fleming) was aware that Mr. Fincham had been vomiting. Specifically, Fleming was told "that because [Mr. Fincham] was vomiting so much, that he had a trashcan or bucket or something."

231. During Fleming's shift on July 5, 2022, the night before Mr. Fincham's death, residents in Mr. Fincham's pod expressed concern about his deteriorating condition. Fleming responded

by saying, "this is what happens when you use drugs on the street, you come in here detoxing like that" and added that she "didn't want to mess with vomit" because she didn't want to "get gross vomit on [her]."

232. On July 5, 2022, at 10:14 P.M., residents in Mr. Fincham's pod pointed toward him to express concern to Fleming and a Wellpath nurse.

233. At 10:36 P.M., Mr. Fincham dropped his medicine cup and struggled to pick it up due to his shaky hands.

234. At 10:42 P.M., a resident knocked on the window to get Fleming's attention, but to no avail. At 10:46 P.M., another resident walked to the phone and back to the door while staring at Mr. Fincham, but Fleming did not respond.

235. At 10:53 P.M., a resident knocked on the window again as Fleming walked by, but she ignored the knock. At 11:05 P.M., another resident knocked on the window when Fleming returned to her station, but she walked off while on the phone. At 11:07 P.M., a resident gestured toward Fleming, and at 11:09 P.M., Fleming entered the pod to clean the bathroom; however, she did not walk over to observe Mr. Fincham.

236. Fleming did not re-enter the pod until 5:04 A.M. on July 6, 2022, when she was serving breakfast. At 5:10 A.M., Mr. Fincham was lying in bed with a tray on his lap. At 5:13 A.M., he remained in the same position, with the tray barely staying on his lap. At 5:19 A.M., a resident adjusted Mr. Fincham's tray before it fell, and at 5:22 A.M., another resident brought Mr. Fincham some water.

237. Fleming collected the trays at 5:26 A.M. She only entered Mr. Fincham's pod three times during her shift, despite her obligation to observe residents more frequently.

238. From the evening hours of July 5, 2022, until approximately 7:30 A.M. on July 6, 2022, Mr. Fincham repeatedly and continuously vomited a black substance into Styrofoam cups, his bed, and a large bucket.

239. In total, Mr. Fincham vomited over two (2) gallons of vomit from the evening hours July 5, 2022, until approximately 7:30 A.M. on July 6, 2022.

240. At the conclusion of her shift, Fleming did not pass any information to Fetherson about Mr. Fincham's medical issues or condition.

### Russell Fincham on July 6, 2022, at 6:00 A.M.

241. At approximately 6:00 A.M. on July 6, 2022, Mr. Fincham continued to exhibit signs of distress such as twitching, convulsing, and the inability to control his movements. Further, during an interview with the SBI, residents who had observed Mr. Fincham on July 5, 2022, and July 6, 2022, stated that Mr. Fincham's fingers and toes curled up due to dehydration.

242. Defendant Fetherson arrived at Mr. Fincham's pod at approximately 7:00 A.M. on July 6, 2022.

243. Fetherson walked over to Mr. Fincham and looked in his general direction.

244. At this time, there was a bucket and cup full of black vomit directly next to Mr. Fincham's bed; however, the floor near Mr. Fincham's bed did not contain vomit.

245. At approximately 7:05 A.M., Mr. Fincham vomited black bile on the floor beside his bed and his breathing became more labored.

246. Fetherson re-entered Mr. Fincham's pod at approximately 7:14 A.M. He walked towards Mr. Fincham and looked in the direction of Mr. Fincham and the black vomit on at least seven (7) occasions. Also, during this visit to the pod, another resident explained in detail to Fetherson that Mr. Fincham had been vomiting and showing signs of distress since the night

56

before (July 5, 2022). At this time, Fetherson observed over two (2) gallons of black vomit that Mr. Fincham had vomited.

247. Despite learning about Mr. Fincham's condition from the night prior, Fetherson merely told Mr. Fincham that he could bring him "a fresh trash can" and solely focused on and directed residents within Mr. Fincham's pod to sweep the floor and discard trash. Fetherson then exited the pod.

248. At approximately 7:24 A.M., residents within Mr. Fincham's pod began looking at Mr. Fincham with grave concern.

249. At approximately 7:32 A.M., Fetherson re-entered the pod with a broom and dustpan. He then began to sweep areas of the pod, cleaned the pod telephone, and further directed residents of the pod to clean the pod. Residents of Mr. Fincham's pod again expressed their concern about Mr. Fincham's health to Fetherson. During this visit to the pod, Fetherson exhibited great nonchalance and indifference for Mr. Fincham's deteriorating condition.

250. Fetherson exited the pod at 7:39 A.M.

251. Fetherson re-entered the pod at approximately 7:48 A.M. He then approached and looked at Mr. Fincham as he stood over him.

252. At 7:50 A.M., a resident within Mr. Fincham's pod then demonstrated to Fetherson how Mr. Fincham would consistently experience wrist drop, or in other words, lose control of his wrist, causing it to seize up without any control.

253. Upon information and belief, wrist drop is usually caused by nerve damage. Nerve damage can derive from opioid withdrawals and/or drug toxicity.

254. Fetherson then exited the pod at approximately 7:54 A.M. After exiting the pod, Fetherson swept the outside of the pod, again exhibiting no urgency with respect to Mr. Fincham's deteriorating condition.

255. At 7:55 A.M. Fetherson scanned his badge in an effort to electronically evidence a tour round but did not enter the pod.

256. At 7:58 A.M., Defendants Fetherson and Englert entered the pod to take Mr. Fincham's vitals.

257. Englert began working for Wellpath in February 2022, approximately five months before Mr. Fincham's death.

258. When Englert first made contact with Mr. Fincham, she immediately noticed that he had filled up a bin with black vomit.

259. The bin was comprised of approximately two (2) gallons of black vomit.

260. Englert told the SBI in its follow-up investigation that she was aware that the black vomit was indicative of old blood and a sign of a gastrointestinal (GI) bleed.

261. Other residents in Mr. Fincham's pod informed Englert that they had been trying to get Mr. Fincham to drink water throughout the night.

262. Mr. Fincham exhibited an inability to effectively control his body. Particularly, Mr. Fincham experienced wrist drop in front of Englert and Fetherson.

263. At 8:01 A.M., Mr. Fincham lost control of his motor functions, and his breathing became more laborious in front of Englert and Fetherson.

264. Englert then placed the cuff of a blood pressure meter on Fincham's left arm and attempted to obtain his blood pressure. Mr. Fincham appeared lifeless and in physical distress as Englert attempted to obtain a blood pressure reading.

265.  Englert was unable to obtain a blood pressure reading because it was "dangerously low," as she later admitted to SBI investigators. She (Englert) took Mr. Fincham's manual pulse, which was in the "130s to 140s" range, and observed that he was taking "22 breaths per minute."

266.  Mr. Fincham simultaneously experienced wrist drop in front of Fetherson and Englert. Englert then attempted to pry Mr. Fincham's hand back to counter the effects of his wrist seizing up.

267.  Englert later told SBI investigators that Mr. Fincham's fingers and toes were curled up. According to Englert, this is a symptom of severe dehydration and electrolyte depletion.

268.  Englert's attempt to pry back Mr. Fincham's hand evidenced her awareness of the physical manifestations of Mr. Fincham's fentanyl toxicity and opioid withdrawals.

269.  Upon information and belief, Englert exited the pod at 8:04:38 AM and told Defendant Smith, the Director of Nursing, that Mr. Fincham exhibited signs of decompensating with low blood pressure and extreme lethargy.

270.  Englert left and purportedly sought to call emergency medical services (EMS). However, Defendant Smith told Englert that she could not call EMS without permission from a medical provider, such as a doctor or nurse practitioner.

271.  Englert then called Physician Assistant D. Walters twice, but Walters did not answer. Thereafter, Englert called Nurse Practitioner Nunnally, who had worked the previous night, and described Mr. Fincham's status. NP Nunnally advised Englert to call 911.

272.  However, rather than calling 911 immediately, Englert contacted a sergeant with MCSO, as she had been instructed that a representative of MCSO needed to make the call to

EMS. Englert relayed the situation to the sergeant and asked him to call 911 before ending the call.

273.   A few minutes later, the same sergeant called her back and informed her that she had to call 911 herself. Precious minutes passed during the back-and-forth between Englert and the sergeant over who was responsible for calling 911.

274.   The delay in calling 911 demonstrates that neither MCSO employees, Englert, nor Smith were aware of any set policy or procedure regarding the process for obtaining emergency medical services.

275.   Upon information and belief, Englert never documented Mr. Fincham's vitals and low blood pressure results obtained at 7:58 A.M. on July 6, 2022, in Mr. Fincham's medical chart.

276.   Upon information and belief, Wellpath's medical plan with Mecklenburg County, Sheriff McFadden, and MCDC states that Narcan should be administered as soon as possible to individuals who fall into the administration criteria below:

   a.   Known or suspected opiate/opioid overdose;

   b.   Signs of possible opiate/opioid overdose;

         i. Respiratory depression;

         ii. Decreased respiratory rate of <12/min;

         iii. Altered mental status of unknown origin; from mild to unresponsive

         iv. Constricted/pinpoint pupils

         v. Low to normal heart rate; and/or

         vi. low blood pressure.

   c.   Unresponsive with unknown cause

d.   Pulseless or apneic

277.   Accordingly, per Wellpath, Mecklenburg County, and Sheriff McFadden's Policies and Procedures, Narcan should be used in the event of an emergency for at-risk patients or anyone who is suspected of having an opiate/opioid overdose.

278.   Further, Narcan was supposedly readily available for use in cases of medical emergencies. According to Sheriff McFadden who spoke on the subject during an interview published on August 12, 2024, MCDC has Narcan machines in MCDC and inside each pod[24].

279.   Upon information and belief, at 8:05:46, due to the apparent physical distress and lifeless nature of Mr. Fincham, another resident of MCDC attempted to check the pulse of Mr. Fincham.

280.   At 8:06 A.M., Fetherson re-entered the pod and again observed Mr. Fincham as he experienced wrist drop and breathed heavily.

281.   Fetherson causally talked with other residents within the pod and then exited the pod to bring trash bags back into the pod so that the other residents could continue their clean up duty.

282.   At 8:12 A.M., Fetherson closed the door to the pod and remained in the hall outside of the pod. Fetherson was personally and actually aware of Mr. Fincham's dire medical condition.

283.   Mr. Fincham continued to show signs of discomfort, pain, agitation, restlessness, and irritability.

284.   At 8:20:20 A.M., employees of Wellpath rolled a wheelchair to the outside of Mr. Fincham's pod. Those Wellpath employees then stood outside of Mr. Fincham's pod while

---

[24] https://www.wbtv.com/2024/08/12/mecklenburg-county-jail-deaths-double-under-sheriff-mcfadden/

casually chatting with Fetherson and other employees of Mecklenburg County and Sheriff McFadden.

285. Fetherson and Wellpath employees and/or agents, including Englert, Smith, and Warren, waited until 8:23:10 A.M. to enter Mr. Fincham's pod with the wheelchair.

286. Mr. Fincham began increasingly struggling for his breath during the nearly three (3) minute period between when the wheelchair was brought to the outside of the glass door of his pod and when Fetherson and the Wellpath employees and/or agents, including Englert, Smith, and Warren, entered the pod.

287. At 8:24 A.M., Warren placed her hand on Mr. Fincham's chest and purportedly noticed that Mr. Fincham was not breathing. Defendants then attempted to enact life saving measures to no avail.

288. At 8:29 A.M., Wellpath agents and/or employees administered Naloxone (Narcan).

289. Based upon Wellpath, Mecklenburg County, and Sheriff McFadden's policies and procedures, Narcan should have been administered to Mr. Fincham immediately after Englert observed Mr. Fincham's low blood pressure, decompensation and extreme lethargy. This is particularly true when considering that Englert knew that Mr. Fincham had ingested a lethal amount of fentanyl prior to his incarceration on July 3, 2022, and was suffering from opioid withdrawals.

290. Mr. Fincham was pronounced dead at 8:56 A.M.

291. At all times relevant herein, Mr. Fincham showed signs of discomfort, pain, agitation, restlessness, and irritability.

292. Moreover, policies and procedures of Wellpath, Mecklenburg County, and Sheriff McFadden mandate that "in emergency situations, patient transfer to an acute care hospital should not be delayed due to lack of provider response or order."

293. Englert and Fetherson unnecessarily delayed seeking Mr. Fincham's transfer to an acute care hospital based on their interactions, observations, and knowledge of Mr. Fincham's condition as follows:

    a. Fetherson became aware that Mr. Fincham vomited two (2) gallons of black vomit when he came in contact with Mr. Fincham at 7:14 A.M.

    b. Fetherson became aware of Mr. Fincham physical distress at 7:55 A.M.

    c. Englert noticed that Mr. Fincham vomited two (2) gallons of black vomit at 7:55 A.M.

    d. Englert personally observed that Mr. Fincham's wrist seized up at 8:00 A.M.

    e. Englert obtained a low blood pressure reading while noticing Mr. Fincham's extreme lethargy at 8:04 A.M.

    f. Englert unnecessarily sought provider approval for emergency services after having concern for Mr. Fincham's condition at approximately 8:10 A.M.

    g. Englert and Smith delayed obtaining emergency medical services by seeking provider approval in an emergency situation contrary to policies set forth by Wellpath, Mecklenburg County, and Sheriff McFadden.

294. Neither Fetherson, nor King, nor Fleming, nor Wellpath employees/agents, including Englert; Smith; Warren; and Elliott-McLaren, who were all present with (or in the vicinity of) Mr. Fincham up until that time, (1) called for emergency medical services or (2) requested authorization from a provider or the director of MCDC to immediately transfer Mr. Fincham

63

to the hospital. These actions and/or failures occurred despite the fact that Mr. Fincham was visibly distressed; told Elliott-McLaren that he was a daily user of fentanyl; told Elliott-McLaren that he had consumed five (5) Xanax bars and one-half (½) gram of fentanyl on July 3, 2022, prior to his incarceration; exhibited signs of drop wrist; vomited at least two (2) gallons of black vomit from the evening of July 5, 2022, until approximately 7:30 A.M. on July 6, 2022; had low blood pressure; and exhibited decompensation and/or extreme lethargy. These actions and/or failures occurred despite that fact that several residents and alerted detention officers, including Fetherson and Flemming, of Mr. Fincham's severe and deteriorating condition.

295. From approximately 11:00 A.M. on July 3, 2022, through 8:25 A.M. on July 6, 2022, it was evident to Fetherson, King, Fleming, Wellpath, Englert, Smith, and Warren that Mr. Fincham was undergoing a severe reaction to fentanyl toxicity, as well as opioid withdrawals. They all knew that Mr. Fincham had told Elliott-McLaren that he had taken a lethal amount of Fentanyl on July 3, 2022, prior to his incarceration. They were also aware that he was housed in the observation pod and prescribed medication in order to detox from prior drug use.

296. Rather than transporting Mr. Fincham to the hospital or calling for emergency medical services, all Defendants took no action.

297. Several of the instances that Mr. Fincham was checked on in person occurred by one of the MCDC detention officers walking by the door and merely glancing into it for a fraction of a second, which was grossly insufficient considering his life-threatening medical condition.

298. King informed SBI investigators after Mr. Fincham's death that residents informed her that they tried to get the night shift officer (Fleming) to call medical for Mr. Fincham due to him throwing up.

299. Mr. Fincham's toxicology report indicated Acute Synthetic Fentanyl Toxicity in his blood.

300. All Defendants failed to monitor for the emergence of opioid withdrawal indicators including but not limited to the following: muscle aches, nausea, piloerection, sweating, seizures, tremors, vital signs that are outside the normal range, vomiting, muscle rigidity, dilated pupils, incoherent speech, and hypotension.

301. All Defendants were not alert to any indicators of Mr. Fincham being unwell due to their failure to monitor him.

302. Sheriff McFadden failed to train his custodial staff to make an immediate referral to medical services when (1) they observe potential signs and symptoms of withdrawal, (2) an individual otherwise appears unwell, and (3) an individual reports experiencing withdrawal.

303. Sheriff McFadden failed to provide custodial staff with first aid training that included training on giving CPR, managing opioid withdrawal (e.g., checking respirations, positioning patient to avoid aspiration, and administering naloxone), and managing seizures (e.g., preventing head trauma, positioning the patient to avoid aspiration) while awaiting emergency medical services (EMS).

304. On December 21, 2021, the Division of Health Service Regulation (DHSR) Construction Section Jails and Detention Unit, conducted a bi-annual inspection and a complaint investigation to determine compliance with 10A NCAC Subchapter 14J Jails, Local Confinement Facilities. This supplemental biannual inspection and complaint investigation found deficiencies whereby corrections were required. Russell Fincham's death supports an inference that Defendant Mecklenburg County has failed to implement these recommendations

in a meaningful manner to improve the treatment of prisoners with serious mental illness and medical conditions at MCDC.

305. Defendants maintained insufficient policies and procedures and provided inadequate staff training, or even no training at all, regarding the provision of emergency medical care to MCDC residents with a serious and/or life-threatening medical conditions. These deficiencies include, but are not limited to, insufficient direction as to what circumstances require emergency medical care and the procedure for summoning emergency medical care. These failures directly caused the denial of the emergency medical attention and treatment that Russell Fincham required, leading to his untimely and preventable death in July 2022.

306. H.I.G. and Wellpath have unity of ownership and unity of interests and/or Wellpath and their employees/agents are agents of H.I.G. Given their very lucrative financial interests, H.I.G.,[25] controls and manages Wellpath. It placed at least two tenured H.I.G. Managing Directors and a Principal in-house on the Wellpath Board of Directors to manage, supervise, direct, and lead Wellpath. H.I.G. knew or should have known at the time it acquired Wellpath that (1) the medical and mental health care provided by Wellpath at MCDC was inadequate, incompetent, and understaffed and (2) that such conditions, customs, and practices had previously led to unconstitutional violations of detainees and prisoners, caused serious bodily harm and/or death of detainees and prisoners, and that unless abated and remedied, it was foreseeable that such harm and/or death would continue to re-occur. H.I.G., Wellpath, and the Nursing Defendants acted with deliberate indifference to Russell Fincham's medical needs.

---

[25] One of Nashville's largest private companies merges with California firm, changes name. https://www.bizjournals.com/nashville/news/2018/11/07/one-of-nashvilles-largest-private-companies- merges.html.

They maintained incompetent staff, were understaffed, and allowed non-physician staff to make medical decisions and issue medical orders.

307. Like Mr. Fincham, other residents at MCDC have suffered painful drug withdrawal episodes or have died as a result of Defendant Mecklenburg County's deliberate indifference to serious medical needs and drug-related crises.

308. Defendant Mecklenburg County knew or should have known of Wellpath's dismal record in managing the risk of drug and alcohol withdrawal in their jail and detention facilities.

309. Sheriff McFadden, who knew or should have known that Wellpath had this abysmal track record in MCDC and who knew or should have known that Wellpath was failing to adequately treat residents in other county jails, endorsed the contract with Wellpath, encouraging the Mecklenburg County Board of Commissioners to continue to allow Wellpath to inadequately treat residents like Mr. Fincham in MCDC. Moreover, Sheriff McFadden, who knew or should have known that his agents and/or employees at MCDC were routinely derelict in failing to supervise and timely summon critical life-saving medical care for ill residents, abdicated his duty to supervise, monitor, and train his staff. Sheriff McFadden's conduct has thus led to the unconstitutional deprivations experienced by residents like and including Mr. Fincham.

310. Defendant Mecklenburg County was on notice of Wellpath's inadequate staffing, and the deficiency of their policies based on the prior years' needs, assessments, and previous litigation relating to those policies. Defendant Mecklenburg County was also well aware of Wellpath's and H.I.G.'s policies relating to the lack of mental health assessments, lack of drug addiction or drug withdrawal assessments, and the potential negative consequences of these policies. Defendant Mecklenburg County is deliberately indifferent to the treatment of

67

prisoners, including the residents of MCDC, who suffer from serious medical and mental health conditions, including opiate related medical crises.

## N.C. R. Civ. Pro. 9(j) - Nursing Defendants

311. The attorneys representing Plaintiffs object to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the bases that this Rule seems to require plaintiffs to prove their case before factual discovery has even begun, and that this Rule denies medical malpractice plaintiffs their rights of due process and equal protection under the law, of the right to open courts, and of the right to a jury trial (in violation of both the United States and North Carolina Constitutions). Furthermore, Rule 9(j) is an unconstitutional violation of the following: (a) Amendment VII and Amendment XIV of the United States Constitution; and (b) Article I, Sections 18, 19, and 25 of the North Carolina Constitution. In addition, this complaint also alleges facts establishing breaches of constitutional and common law duties for which certification of compliance with Rule 9(j) are not required. In particular, certain claims in this suit do not allege "medical malpractice by a health care provider . . . in failing to comply with the applicable standard of care," but rather, allege claims based on deprivation of constitutional rights and based on the principles of *respondeat superior* and apparent agency. Such claims fall outside the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure and, as such, compliance with Rule 9(j) with respect to these and other claims is not required.

312. Without waiving these objections, the attorneys for Plaintiffs provide information below to comply with the requirements of Rule 9(j) in an abundance of caution. Pursuant to Rule 9(j) of the Rules of Civil Procedure, the toxicology report, autopsy, and investigation report by chief medical examiner made available to Plaintiffs after reasonable inquiry have

been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify as a forensic pathologist who performed the second autopsy. Should a court later determine that anyone who has reviewed the autopsy of decedent does not meet the requirements of Rule 702(b) or 702 (c) of the Rules of Evidence, then Plaintiffs will seek to have such person(s) qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and Plaintiffs move the Court (as provided in Rule 9 of the Rules of Civil Procedure) that such person(s) be qualified as an expert witness.

## **FIRST CAUSE OF ACTION**
### **WRONGFUL DEATH**
#### **(Against Defendants Sheriff McFadden, Fleming, Fetherson, and King)**

313. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

314. N.C.G.S. § 153A-224 is a safety statute expressly enacted to protect a pre-trial detainee like Mr. Fincham whose liberty has been taken and who is confined in a local detention facility.

315. The MCDC is a local confinement facility for the purposes of N.C.G.S. § 153A-224.

316. The actions and omissions of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, including, but not limited to, the following:

    a. In Failing to keep Mr. Fincham under a special watch;

    b. In failing to use even slight care and caution in safekeeping Mr. Fincham;

    c. In failing to sufficiently monitor Mr. Fincham during his detainment so as to determine his safety and well-being;

    d. In failing to properly train and/or supervise agents, employees, nurses, and officers under their command in the proper methods for identifying inmates and detainees in need of serious medical attention;

69

e. In failing to draft and/or institute proper policies and/or procedures necessary to see that inmates and detainees are provided appropriate medical care and protection from emergency and perilous medical conditions;

f. If such policies/procedures exist, in failing to follow the same in providing the appropriate care, protection, and care necessary to ensure Mr. Fincham's well-being;

g. In failing to heed or respond to information and reports from other inmates so as to determine the severity and significance of Mr. Fincham's medical condition and so as to aid in procuring and administering the necessary treatment, monitoring, and supervision of Mr. Fincham;

h. In knowingly, deliberately, and consciously denying appropriate medical treatment, monitoring and supervision to Mr. Fincham;

i. In failing to take the appropriate steps to provide proper and sufficient medical treatment, monitoring, and supervision to Mr. Fincham when they had actual and constructive knowledge of Mr. Fincham's condition;

j. In completely ignoring reports from other inmates and detainees regarding Mr. Fincham's condition and his need for emergency medical treatment;

In failing to comply with applicable statutes and administrative codes including, but not limited to, N.C.G.S. § 153A-224 and N.C.A.C. 14J.0601;

k. In failing to provide appropriate medical treatment;

l. In failing to contact emergency medical services;

m. In failing to secure emergency medical care from a licensed physician, and/or

n.   In failing to transport Mr. Fincham to the hospital emergency department after it was clear that Mr. Fincham was undergoing severe opioid toxicity and withdrawal; violated their affirmative obligation under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care for Mr. Fincham, as well as state regulations on observing residents and reporting medical concerns.

317.   Their breaches of the affirmative duty imposed by a safety statute constituted negligence *per se*.

318.   These breaches of statutory duties imposed by N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care precludes the application of governmental immunity.

319.   As a proximate result of the negligence of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, Mr. Fincham suffered agonizing pain and humiliating abandonment until he died.

320.   Mr. Fincham was in the class of citizens that N.C.G.S. § 153A-224 was enacted to protect.

321.   Sheriff McFadden is liable, under the doctrine of *respondeat superior*, both under common law and by statute, for the actions and omissions of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King that led to Mr. Fincham 's death.  The Sheriff's duty to operate the county jail in a safe manner is a non-delegable duty under N.C.G.S. § 162-24.

322.   Further, Defendants Sheriff McFadden, Fleming, Fetherson, and King are individually liable.  Some of their actions were taken outside the scope of their authority, including the

systematic avoidance of required in-person cell checks. Further, their actions of failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to monitor Mr. Fincham after having identified him as at risk for opioid withdrawal during screening all demonstrated malice and willful and wanton and reckless disregard for his safety.

323. Conduct that exceeds the scope of authority or that shows such malice and willful or wanton or reckless disregard for a pre-trial detainee pierces the shield of public officer immunity.

324. As a proximate result of the willful, wanton, and reckless conduct of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, Mr. Fincham suffered agonizing pain and humiliating abandonment until he died.

325. Plaintiffs, in their capacities as Co-Administrator's of the Estate, are entitled to recover from Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Mr. Fincham experienced in the time before his death.

326. Plaintiffs also seek and are entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendants Sheriff McFadden, Fleming, Fetherson, and King, who all showed actual malice toward Mr. Fincham and willful, wanton, and reckless disregard for his safety.

### SECOND CAUSE OF ACTION
### WRONGFUL DEATH
**(Against Defendants Wellpath, Englert, Elliott-McLaren, Smith and Warren)**

327. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

328. Defendants, Englert, Elliott-McLaren, Smith, and Warren, did not comply with the accepted standards of care for their healthcare profession in the same or similar communities at the times of the negligent acts and/or omissions complained of herein.

329. Defendants, Englert, Elliott-McLaren, Smith, and Warren are liable and were negligent in at least the following respects:

    a. In Failing to keep Mr. Fincham under a special watch;

    b. In failing to use even slight care and caution in safekeeping Mr. Fincham;

    c. In failing to sufficiently monitor Mr. Fincham during his detainment so as to determine his safety and well-being;

    d. In failing to properly train and/or supervise agents, employees, nurses, and officers under their command in the proper methods for identifying inmates and detainees in need of serious medical attention;

    e. In failing to draft and/or institute proper policies and/or procedures necessary to see that inmates and detainees are provided appropriate medical care and protection from emergency and perilous medical conditions;

    f. If such policies/procedures exist, in failing to follow the same in providing the appropriate care, protection, and care necessary to ensure Mr. Fincham's well-being;

    g. In failing to heed or respond to information and reports from other inmates so as to determine the severity and significance of Mr. Fincham's medical condition and

so as to aid in procuring and administering the necessary treatment, monitoring, and supervision of Mr. Fincham;

h. In knowingly, deliberately, and consciously denying appropriate medical treatment, monitoring and supervision to Mr. Fincham;

i. In failing to take the appropriate steps to provide proper and sufficient medical treatment, monitoring, and supervision to Mr. Fincham when they had actual and constructive knowledge of Mr. Fincham's condition;

j. In completely ignoring reports from other inmates and detainees regarding Mr. Fincham's condition and his need for emergency medical treatment;

In failing to comply with applicable statutes and administrative codes including, but not limited to, N.C. Gen. Stat. § 153A-224 and N.C.A.C. 14J.0601;

k. In failing to provide appropriate medical treatment;

l. In failing to contact emergency medical services;

m. In failing to secure emergency medical care from a licensed physician, and/or

n. In failing to transport Mr. Fincham to the hospital emergency department after it was clear that Mr. Fincham was undergoing severe opioid toxicity and withdrawal;

o. Otherwise failing to comply with the accepted standards of care for healthcare professionals in the same or similar communities.

330. As a proximate result of the negligence of Defendants Englert, Elliott-McLaren, Smith, and Warren, Mr. Fincham suffered agonizing pain and humiliating abandonment until he died.

331. A person of ordinary intelligence and prudence could have foreseen that death would be the probable result of the failure to provide proper medical care to a person who was at risk for opioid toxicity and withdrawal.

74

332. Defendant Wellpath is liable, under the doctrine of *respondeat superior*, for the medical negligence of its agents, Defendants Englert, Elliott-McLaren, Smith, and Warren, in providing healthcare to Mr. Fincham.

333. Defendant Wellpath also failed to adhere to the medical care plan submitted to and approved by Mecklenburg County officials, as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001, because the Nursing Defendants were not supervised by a licensed physician, exceeding the scope of their licensure and constituting negligent supervision.

334. Plaintiffs, in their capacity as Co-Administrator's of the Estate, are entitled to recover from Defendants Englert, Elliott-McLaren, Smith, Warren, and Wellpath, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Mr. Fincham experienced in the time before his death.

335. Plaintiffs also seek and are entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendants Englert, Elliott-McLaren, Smith, Warren, and Wellpath, LLC, jointly and severally. The actions of Defendants Englert, Elliott-McLaren, Smith, and Warren as alleged hereinabove showed actual malice toward Mr. Fincham and willful, wanton, and reckless disregard for his safety. Defendants Englert, Elliott-McLaren, Smith, and Warren were the managing agents for Defendant Wellpath in MCDC, subjecting Defendant Wellpath to punitive damages.

**THIRD CAUSE OF ACTION**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL HEALTH NEEDS IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTIONOF THE UNITED STATES (42 U.S.C. § 1983)**
**(Against Defendants Hallman, Sheriff McFadden, H.I.G., Fetherson, Fleming, and King)**

336.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

337.    All Defendants except the Surety are "persons," and their actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

338.    Defendants Sheriff McFadden, Mecklenburg County, Wellpath, and H.I.G. have inadequate policies, procedures, and practices for identifying residents in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to residents with medical and mental health issues.

339.    Defendants have inadequate policies, procedures, and practices for identifying residents in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to residents with medical and mental health issues.

340.    Defendants knew or should have known that there was a strong likelihood that Mr. Fincham posed a threat to himself or others.

341.    Defendants failed to provide necessary medical and mental health evaluation and treatment to Mr. Fincham while he was held at MCDC, despite his history of substance abuse, obvious symptoms of withdrawal, and information that he was under the influence of opioid medication.

342.    These failures constituted objectively unreasonable indifference to serious medical needs, health, and safety. These failures further constituted deliberate indifference to Mr. Fincham's serious medical needs, health and safety. As a direct and proximate result of

Defendants' conduct, Mr. Fincham experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

343. The rights of pre-trial detainees and the conduct of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

344. The practice in MCDC of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care and systematically failing to place medically distressed detainees on a four-times-per-hour direct observation watch as required by North Carolina law [10A NCAC 14J.0601(c)] violated the standard of objective reasonableness.

345. Defendant McFadden also failed to train his detention facility officers and other agents, including the Defendants herein, in recognizing and properly responding to pre-trial detainees' medical needs, posed substantial risk of serious harm, which also violates the standard of objective reasonableness. Defendant McFadden is sued in his official capacity for this Fourteenth Amendment violation.

346. Further, the specific acts and omissions of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King complained of herein were objectively unreasonable and violated Mr. Fincham's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Mr. Fincham to the hospital after he had been identified as at a risk for opioid withdrawal.

347. Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference. These included the acts of failing to provide

appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Mr. Fincham to the hospital after he had reported that he been identified as a risk for opioid withdrawal.

348. Further, Mr. Fincham was detained under conditions that posed a substantial risk of serious harm. Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King knew of and disregarded those risks to Mr. Fincham's health and safety, including hearing, seeing, and ignoring indicators of opioid withdrawal and toxicity. Such conduct violated Mr. Fincham's Fourteenth Amendment rights.

349. Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions complained of herein showed reckless disregard and open contempt for Mr. Fincham's well-being by Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, satisfying the deliberate indifference standard.

350. Defendants McFadden, Fleming, Fetherson, and King had actual and constructive knowledge of Mr. Fincham's serious medical condition but were deliberately indifferent to Mr. Fincham's need for critical and essential assessment and medical treatment.

351. Defendant Fleming, Defendant Fetherson, and Defendant King are sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

352. The actions of these same individual defendants so violated the standards of decency as to shock the conscience of the community and thus violated Mr. Fincham's right to substantive due process, which is also protected by the Fourteenth Amendment.

353. As a result of these violations by Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, Mr. Fincham suffered an agonizing death under inhumane conditions and was left to die in his jail cell.

354. Plaintiffs seek and are entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King, including but not limited to damages for the pain and suffering and humiliation that Mr. Fincham experienced before his death.

355. Plaintiffs also seek and are entitled to punitive damages from Defendant Fleming, Defendant Fetherson, and Defendant King in their individual capacities, as allowed under 42 U.S.C. § 1983, due to their deliberate and reckless indifference to Mr. Fincham's federally protected rights.

356. Defendant McFadden is also liable as the supervisor and director of MCDC, due to the custom and practices at the jail of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care, not properly training the jail's detention officers on how to attend to the urgent medical needs of detainees at risk for opioid withdrawal, and failing to place Mr. Fincham on a four-times-per-hour direct observation watch, as required by law. There was a causal link between the willful and wanton indifference to these jail processes, guard training, and detainee monitoring deficiencies and Mr. Fincham's death.

357. Defendant McFadden is also liable as the supervisor of Defendants Fleming, Fetherson, and King as he implicitly authorized, approved, or knowingly acquiesced to their deliberate indifference to Mr. Fincham's federally protected rights.

358. Upon information and belief, Defendant Fetherson had the ability to view Mr. Fincham, and he knew or should have known of Mr. Fincham's life-threatening medical condition at or

near the time he displayed indicators of opioid withdrawal, and he failed to direct any of the Defendants to transport Mr. Fincham to the hospital or to contact emergency medical services in sufficient time to save his life.

359. The aforementioned acts of Defendants were conducted with conscious disregard for the safety of Mr. Fincham and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**FOURTH CAUSE OF ACTION**
**FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983**
**(Against Defendants Wellpath, H.I.G. Biondi, Englert, Elliot-McLaren, Smith, and Warren)**

360. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

361. Defendants Englert, Elliott-McLaren, Smith, Warren, Biondi, H.I.G. and Wellpath are "persons," and their actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

362. The rights of pre-trial detainees and the conduct of Defendants Englert, Elliott-McLaren, Smith, Warren, Biondi, H.I.G. and Wellpath, towards Mr. Fincham are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

363. The specific acts and omissions of Defendants Englert, Elliott-McLaren, Smith, and Warren, complained of herein, which are imputed to Defendant H.I.G., Biondi, and Wellpath, were objectively unreasonable and violated Mr. Fincham's rights under the Fourteenth Amendment. These acts and omissions include the following:

a. In Failing to keep Mr. Fincham under a special watch;

b. In failing to use even slight care and caution in safekeeping Mr. Fincham;

c. In failing to sufficiently monitor Mr. Fincham during his detainment so as to determine his safety and well-being;

d. In failing to properly train and/or supervise agents, employees, nurses, and officers under their command in the proper methods for identifying inmates and detainees in need of serious medical attention;

e. In failing to draft and/or institute proper policies and/or procedures necessary to see that inmates and detainees are provided appropriate medical care and protection from emergency and perilous medical conditions;

f. If such policies/procedures exist, in failing to follow the same in providing the appropriate care, protection, and care necessary to ensure Mr. Fincham's well-being;

g. In failing to heed or respond to information and reports from other inmates so as to determine the severity and significance of Mr. Fincham's medical condition and so as to aid in procuring and administering the necessary treatment, monitoring, and supervision of Mr. Fincham;

h. In knowingly, deliberately, and consciously denying appropriate medical treatment, monitoring and supervision to Mr. Fincham;

i. In failing to take the appropriate steps to provide proper and sufficient medical treatment, monitoring, and supervision to Mr. Fincham when they had actual and constructive knowledge of Mr. Fincham's condition;

81

j.   In completely ignoring reports from other inmates and detainees regarding Mr. Fincham's condition and his need for emergency medical treatment;

k.   In failing to comply with applicable statutes and administrative codes, including, but not limited to N.C. Gen. Stat. § 153A-224 and N.C.A.C. 14J.0601;

l.   In failing to provide appropriate medical treatment;

m.   In failing to contact emergency medical services;

n.   In failing to secure emergency medical care from a licensed physician, and/or

o.   In failing to transport Mr. Fincham to the hospital emergency department after it was clear that Mr. Fincham was undergoing severe opioid toxicity and withdrawal;

p.   Otherwise failing to comply with the accepted standards of care for healthcare professionals in the same or similar communities.

364.   Further, those same specific acts as described hereinabove violated the prior Fourteenth Amendment standard of deliberate indifference. These include the acts of Defendants Englert, Elliott-McLaren, Smith, and Warren in failing to provide appropriate medical treatment and failing to contact emergency medical services after Mr. Fincham (1) reported that he had consumed one-half gram of fentanyl and (2) showed signs of a severe opioid toxicity and withdrawals.

365.   Further, Mr. Fincham was detained under conditions that posed a substantial risk of serious harm. Defendants Englert, Elliott-McLaren, Smith, and Warren knew of and disregarded those risks to Mr. Fincham's health and safety, including hearing, seeing, and ignoring his condition of fentanyl toxicity and opioid withdrawals, which violated Mr. Fincham's Fourteenth Amendment rights.

366. Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions of Defendants Englert, Elliott-McLaren, Smith, and Warren as complained of herein showed reckless disregard and open contempt for Mr. Fincham's well-being, satisfying the deliberate indifference standard.

367. Defendants Englert, Elliott-McLaren, Smith, and Warren, had actual knowledge of Mr. Fincham's serious medical condition but was deliberately indifferent to Mr. Fincham's need for critical and essential assessment and medical treatment.

368. Defendants Englert, Elliott-McLaren, Smith, and Warren, are sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

369. The actions of Defendants Englert, Elliott-McLaren, Smith, and Warren, and which are imputed to Defendant Wellpath, so violated the standards of decency as to shock the conscience of the community and thus violated substantive due process also protected by the Fourteenth Amendment.

370. As a result of these violations by Defendants Englert, Elliott-McLaren, Smith, Warren, and Wellpath, LLC, Mr. Fincham suffered an agonizing death under inhumane conditions.

371. Plaintiffs seek and are entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendants Englert, Elliott-McLaren, Smith, Warren, Biondi, H.I.G. and Wellpath, including but not limited to damages for the pain and suffering and humiliation that Mr. Fincham experienced in the time before his death.

372. Plaintiffs also seek and are entitled to punitive damages as allowed under 42 U.S.C. § 1983, due to Defendants Englert, Elliott-McLaren, Smith, Warren's reckless indifference to Mr. Fincham's federally protected rights.

## FIFTH CAUSE OF ACTION
## VIOLATIONS OF FEDERAL CIVIL RIGHTS BY MECKLENBURG COUNTY – 42 U.S.C. §§ 1983 AND 1988
### (Against Mecklenburg County)

373. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

374. Mecklenburg County was, at all times relevant herein, responsible for the formulation and execution of policies regarding the provision of medical care to inmates and detainees in the MCDC.

375. Upon information and belief, at all relevant times herein, Mecklenburg County, acting under color of state law, had in effect de facto policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of officers and nurses working in the MCDC, as herein alleged, including, inter alia:

   a. The failure to implement proper plans, policies and/or procedures necessary to see that inmates and detainees are provided appropriate, necessary and adequate medical care and protection from emergency and perilous medical conditions;

   b. The failure to draft and/or institute proper plans, policies and/or procedures designed to protect the health and welfare of inmates and detainees at the MCDC;

   c. The failure to draft and/or institute proper plans, policies and/or procedures regarding medical supervision of inmates and detainees at the MCDC;

   d. The failure to draft and/or institute proper plans, policies and/or procedures regarding emergency medical care for inmates and detainees at the MCDC to the extent necessary for their health and welfare;

84

e. If such policies/procedures exist, in failing to see that such policies and procedures were followed;

f. The failure to implement proper and reasonable policies and procedures regarding the evaluation, monitoring, supervision, observation, and housing of inmates and detainees in the MCDC in need of medical care including, and especially, inmates and detainees who are suffering from fentanyl withdrawals, mental health issues, and/or have serious medical conditions; and

g. Other policies, customs, and practices to be identified during the course of discovery and/or trial.

376. As a direct and proximate result of said policies, practices and customs, Mr. Fincham was denied his rights under the United States Constitution, including rights secured by the Fourteenth Amendments and/or federal laws.

377. As a direct and proximate result of the deprivation of Mr. Fincham's constitutional and federal rights as alleged herein, Mr. Fincham died a slow, preventable, and totally unnecessary death. Consequently, Plaintiffs, on behalf of the Estate of Russell Fincham, are entitled to recover from Mecklenburg County compensatory damages in an amount in excess of $2,500,000.00.

**SIXTH CAUSE OF ACTION**
**ACTION UNDER BOND**
**(Against Platte River Insurance Company)**

378. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

379. Upon information and belief, Platte River Insurance held the Bond.

380.     The actions of the individual MCSO defendants constituted neglect and malfeasance in their employment with Sheriff McFadden and were taken under the auspice of the office of the Sheriff. As a proximate result, the decedent died.

381.     Further, the negligence described hereinabove should be covered by the Bond, as those Defendants were acting with the non-delegable authority of the Sheriff at all times. As a proximate result, decedent died.

382.     Plaintiffs bring this action on the Sheriff's bond pursuant to N.C.G.S. § 58-76-5.

383.     Plaintiffs, in their capacity as Co-Administrators of the Estate, are entitled to recover on the bond all damages for wrongful death caused by the neglect and malfeasance of the Sheriff and his agents, as allowed by N.C.G.S. § 28A-28-2(b). Such damages are in excess of $25,000.00. Plaintiffs may sue repeatedly on the bond until judgment is paid.

**SEVENTH CAUSE OF ACTION**
**N.C.G.S. § 162-55**
**(Against Defendants Sheriff McFadden, Fleming, Fetherson, and King)**

384.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

385.     The actions and omissions of Defendant McFadden, Defendant Fleming, Defendant Fetherson, and Defendant King showed such reckless indifference and thoughtless disregard for Mr. Fincham's safety that Plaintiffs are entitled to recover treble the compensatory damages awarded to the Estate from them, pursuant to N.C.G.S. § 162-55.  Under the case law, such reckless indifference is equivalent to criminal neglect.

**EIGHTH CAUSE OF ACTION**
**N.C.G.S. § 162-50**
**(Against Defendants Sheriff McFadden, Fleming, Fetherson, and King)**

386.   All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

387.   The actions and omissions of Defendant Fleming, Defendant Fetherson, and Defendant King, which are imputed to Sheriff McFadden under the principle of *respondeat superior*, constituted willful failure or neglect to perform duties imposed upon them under Chapter 162 of the North Carolina General Statutes, including N.C.G.S. § 162-22 (duty to have "care and custody of the jail") and § 162-55 (duty to not "do, or cause to be done, any wrong or injury to the prisoners committed to his custody, contrary to law"), entitling Plaintiffs to a penalty of five hundred dollars ($500.00) under N.C.G.S. § 162-50, in addition to all other remedies sought herein.

**NINTH CAUSE OF ACTION**
**PUNITIVE DAMAGES**
**(Against Sheriff McFadden)**

388.   All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

389.   Upon information and belief, four others died while they were residents of MCDC within one year prior to Mr. Fincham's death.

390.   In Defendant Sheriff McFadden's five and a half years as sheriff of Mecklenburg County, there have been eighteen deaths at the detention center.

391.   Plaintiffs seek punitive damages due to the intentional, reckless, and grossly negligent conduct of the Defendants, which transcends ordinary negligence.

392.   Sheriff McFadden's conduct in maintaining unsafe staffing levels and failing to perform mandated safety checks directly caused or contributed to Mr. Fincham's untimely death.

393. Sheriff McFadden's actions were malicious, oppressive, and in reckless disregard of Mr. Fincham's rights, justifying an award of punitive damages.

394. Specific facts demonstrating the egregious nature of the Defendant's conduct include, but are not limited to, the following:

    a. <u>Failure to Perform Safety Checks</u>: In the 32 hours leading up to Mr. Fincham's death, jail officers missed over 25% of the required safety checks, despite the critical need for monitoring residents, particularly those with medical issues.

    b. <u>Severe Staffing Shortages</u>: On the day of Mr. Fincham's death, staffing was critically inadequate, with only 8 out of the 17 allocated staff members present on his floor, significantly impairing the ability to perform essential safety checks and respond to emergencies.

    c. <u>Pattern of Neglect</u>: Mr. Fincham's death is one of five resident deaths at the Mecklenburg County Jail this year, with the Sheriff's Office cited for missing rounds in four of these cases. This pattern of neglect highlights a systemic disregard for resident safety.

    d. <u>State Inspector Warnings</u>: The jail has been under scrutiny for inadequate staffing. A state inspector previously stated that the staffing levels posed an "imminent threat" to resident and staff safety, yet Defendant McFadden failed to take necessary corrective actions.

    e. <u>Placement in Medical Pod</u>: Mr. Fincham was placed in a pod primarily housing residents with medical issues, heightening the duty of care owed by Defendant McFadden to ensure his safety and well-being.

f. <u>Conscious Disregard</u>: Despite being aware of the critical importance of safety checks and the dangers posed by inadequate staffing, Defendant McFadden consciously failed to take appropriate measures to protect Mr. Fincham and other residents.

395. The cumulative effect of these actions and omissions reflects a willful and wanton disregard for Mr. Fincham's safety and rights, necessitating punitive damages to punish Defendant McFadden and deter similar conduct in the future.

396. Punitive damages are warranted to hold Defendant McFadden accountable for his egregious conduct and to serve as a deterrent against future violations of resident rights.

**TENTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – *MONELL* VIOLATION**
**CUSTOM & PRACTICE IN VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE**
**(Against Defendants Sheriff McFadden in his Official Capacity, Mecklenburg County, Wellpath, LLC, and H.I.G. Capital, LLC)**

397. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

398. The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Fincham's serious medical needs, health, and safety and violating Mr. Fincham's civil rights were the direct and proximate result of customs, practices and policies of Defendants Mecklenburg County, Wellpath, H.I.G. Capital, LLC, and Sheriff Garry McFadden, by and through their agencies, employees and/or agents, as alleged herein.

399. Such policies, customs, and/or practices include but are not limited to:

a. To deny prisoners at MCDC access to medical/psychiatric attention, continuity of care and/or access to a higher level of care not available at MCDC for seriously ill residents;

b. To fail to identify whether newly arrived residents are suffering from drug withdrawal or will likely suffer from drug withdrawal;

c. With respect to drug withdrawal and/or toxicity, to fail to monitor residents, provide adequate medical care, and supervise residents;

d. To fail to perform adequate cell checks and to record unusual activity or behavior;

e. To fail to provide health training with respect to residents with opiate problems;

f. To fail to provide medical or mental health care for residents with serious medical needs;

g. To fail to maintain appropriate, competent, and sufficient medical and mental health staffing;

h. To fail to use appropriate National and State accepted jail minimum standards, procedures, and practices for handling persons suffering from opiate withdrawals;

i. To fail to institute, require, and enforce proper and adequate training, supervision, policies, procedures, and practices concerning handling residents in an emergency crisis at MCDC;

j. To fail to comply with their own policies and procedures and/to fail to supervise to ensure implementation thereof;

k. H.I.G. and Wellpath placed their financial interests and profits before their duty and responsibility to provide sufficient and competent medical/mental health care staff to patient/residents

400. Defendants Mecklenburg County, Wellpath, and H.I.G. Capital LLC, tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of constitutional rights.

401. The customs, policies, and/or practices of Defendants Sheriff McFadden, Mecklenburg County, Wellpath, and H.I.G., were a direct and proximate cause of Plaintiffs' injuries and the death of Mr. Fincham in that Defendants failed to adequately train and supervise their employees and/or agents to prevent the occurrence of the unconstitutional violations suffered by Plaintiffs, Mr. Fincham, and other residents at MCDC. Defendants also failed to promulgate appropriate policies or procedures or take other measures to prevent the unconstitutional violations suffered by Plaintiffs, Mr. Fincham, and other residents at MCDC.

402. As a direct and proximate result of the aforementioned customs, policies, and/or practices of Defendants set forth in the cause of action, Mr. Fincham and Plaintiffs suffered injuries and damages as alleged herein.

403. Defendants Mecklenburg County and Sheriff McFadden were responsible for the formulation and execution of policies regarding the conditions of confinement of pre-trial detainees in MCDC.

404. At all relevant times, Defendants Mecklenburg County and Sheriff McFadden were acting under color of state law, had in effect de facto practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of officers and other care providers who worked and/or were contracted at their two respective law enforcement agencies.

405. MCSO maintained a custom or practice of failing to follow the direct observation rules, supervision rules, and failing to have adequate staffing at the jail.

406. This custom or practice is evidenced by the examples provided herein. During the years leading up to Mr. Fincham's death, it is believed that at least several deaths were the result of Defendant McFadden's deliberate indifference to the medical needs of residents.

407. Custodial staff employed by Sheriff McFadden acted in such an overtly reckless manner to suggest that MCSO – despite the content of written policies – maintained a custom and practice of deliberate indifference.

408. In the years prior to July 2022, Sheriff McFadden had several jail deaths under his watch that were caused, in part, by a failure of his staff to (1) adequately supervise per the minimal requirements set forth by jail standards, and (2) make direct observations of pre-trial detainees that had a medical condition or injury that posed a substantial risk of serious harm. These jail deaths were also caused, in part, by Sheriff McFadden's failure to ensure that his jails were adequately staffed.

409. Upon information and belief, Sheriff McFadden has demonstrated a pattern and practice of deliberate indifference to pre-trial residents' rights. Upon information and belief, in a moment of frustration with his staff over their failure to provide timely reports about issues within the jail, Sheriff McFadden admitted to the challenges and cover-ups he faces. Sheriff McFadden stated:

> "If you really know what all goes on instead of what people telling you, you'll be a little upset too . . . because when you find out, you don't find out the same day it happened . . . you find out two weeks when it happened, and then **I have to cover it up** . . . I have to deal with it and then I got to say this is what happened y'all . . ."

92

410. Upon information and belief, the above-referenced quote highlights Sheriff McFadden's policies and practices of covering up his office's failures to meet the minimum standards set forth by the State of North Carolina.

411. Sheriff McFadden's and Mecklenburg County's actions caused pre-trial detainees to be deprived of their rights secured by the Constitution which is the same harm suffered by Mr. Fincham.

412. As a direct and proximate result of said practices and customs set forth herein, Mr. Fincham was denied his rights under the Fourteenth Amendment.

## ELEVENTH CAUSE OF ACTION
## N.C. GEN. STAT. § 28A–18–1 – SURVIVAL ACTION FOR PAIN AND SUFFERING
### (Against all Individual Defendants Named in their Individual Capacities)

413. For the reasons explained in the First and Second Causes of Action above, Defendants were grossly and wantonly negligent in breaching the widely accepted standards of care that they owed to Mr. Fincham. As a result of this breach of the standard of care, Mr. Fincham suffered an opioid withdrawal, opioid toxicity, a period of pain and suffering, and ultimately, death.

414. Per N.C. Gen. Stat. § 28A–18–1, Plaintiffs seek compensation for this pain and suffering as Mr. Fincham's personal representative.

## TWELVETH CAUSE OF ACTION
## NEGLIGENT SUPERVISION, TRAINING, HIRING, AND RETENTION
### (Against Defendants McFadden, Hallman, and Smith)

415. Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

416. Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

417. These general duties of reasonable care and due care owed to Mr. Fincham by Defendants and each them, include but are not limited to the following specific obligations:

a. To properly and reasonably hire, supervise, train, retain, investigate, monitor, evaluate, and discipline each person (i) who was responsible for providing medical care for Mr. Fincham; (ii) who was responsible for the safe and appropriate jail custody of Mr. Fincham; (iii) who was responsible for properly and reasonably classifying, housing, and monitoring Mr. Fincham; (iv) who denied Mr. Fincham medical attention or access to medical care and treatment; and/or (vi) who failed to summon necessary and appropriate medical care;

b. To properly and adequately hire, supervise, train, retain, investigate, monitor, evaluate, and discipline their employees, agents, and/or law enforcement officers to ensure that those employees/agents/officers act at all times in the public interest and in conformance with law;

c. To make, enforce, and at all times act in conformance with policies and customs that are lawful and protective of individual rights, including Mr. Fincham's rights.

d. To refrain from making, enforcing, and/or tolerating the wrongful policies and customs set forth herein.

418. Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of North Carolina.

419. As a direct and proximate result of Defendants' failure, Russell Fincham suffered injuries and damages as alleged herein.

94

## THIRTEENTH CAUSE OF ACTION
## SUPERVISORY LIABILITY
## SURVIVAL ACTION - 42 U.S.C. § 1983
## (Against Defendants Smith and Hallman)

420. Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

421. The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Mr. Fincham's serious medical needs, health, and safety and violating decedent's civil rights were the direct and proximate result of customs, practices, and policies of Defendants Smith and Hallman, as alleged herein.

422. Such policies, customs, and/or practices include but are not limited to an ongoing pattern of deliberate indifference, including the following: the failure to ensure implementation of appropriate medical and emergency treatment plans; the failure to act upon clearly life-threatening symptoms and reports; the failure to provide appropriate staffing and training at MCDC to provide minimally adequate medical treatment for seriously ill residents; and the failure to implement a policy to ensure that staff would contact and summon emergency medical treatment in a timely manner.

423. Defendants Smith and Hallman, tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of constitutional rights.

424. The customs, policies, and/or practices of said Defendants were a direct and proximate cause of Plaintiff's injuries and the death of Mr. Fincham in that Defendants failed to adequately train and supervise their employees and/or agents to prevent the occurrence of the unconstitutional violations suffered by Plaintiffs, Mr. Fincham, and other residents at MCDC.

Defendants also failed to promulgate appropriate policies and procedures or take other measures to prevent the unconstitutional violations suffered by Plaintiffs, Mr. Fincham, other residents at MCDC.

425. Each of the H.I.G. and Wellpath supervisors, managers, directors, executives' acts and/or omissions and failure to supervise their subordinates was taken with deliberate indifference to the medical care of residents, such as Mr. Fincham, as set forth above.

426. Each of the H.I.G., Wellpath, and Nursing Defendants failed to supervise the medical and/or mental health services for detainees and knew or should have known that MCDC suffered from extreme overcrowding, inadequate and/or incompetent medical staffing, as set forth above, thereby violating the constitutional rights of patient-prisoners', state and federal laws, and departmental policy and procedure.

427. As a direct and proximate result of the aforementioned customs, policies, and/or practices of Defendants, Mr. Fincham and Plaintiffs suffered injuries and damages as alleged herein.

428. The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**FOURTEENTH CAUSE OF ACTION**
**NEGLIGENCE**
**SURVIVAL ACTION - 42 U.S.C. § 1983**
**(Against Defendants McFadden, Fetherson, Fleming, King, Smith, and Hallman.)**

429. Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

430. At all times, each individual and corporate Defendant owed Plaintiffs' decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

431. At all times, each individual and corporate Defendant owed Plaintiffs' decedent the duty to act with reasonable care. These general duties of reasonable care and due care owed to Plaintiffs' decedent by all Defendants include but are not limited to the following specific obligations:

   a. To provide, or have provided sufficient, competent, prompt and appropriate medical care to Mr. Fincham;

   b. To provide safe and appropriate jail custody for Mr. Fincham, including reasonable classification, monitoring, and housing;

   c. To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for residents' status as suffering from opioid withdrawals, mentally ill, suicidal, and/or emotionally disturbed person;

   d. To refrain from abusing their authority granted them by law;

   e. To refrain from violating Plaintiffs' rights guaranteed by the United States and North Carolina Constitutions, as set forth above, and as otherwise protected by law.

432. Defendants and their employees and agents, failed to comply with professional standards in the treatment of Mr. Fincham's physical fitness by failing to appropriately assess and evaluate his physical condition, propensity to suffer from opioid withdrawals, properly observe him, and in other ways to be develop in discovery.

433. These Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Mr. Fincham, and

failed to enact appropriate standards and procedures that would have prevented such harm to him.

434. Together, these Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Plaintiffs suffered injuries and damages as alleged herein.

435. The negligent conduct of Defendants was committed within the course and scope of their employment.

436. The aforementioned acts of Defendants were conducted with conscious disregard for the safety of Plaintiffs and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

437. Defendant McFadden is vicariously liable for the negligent actions of its employees.

## JURY DEMAND

438. Plaintiffs request that all issues be tried before a jury of their peers.

WHEREFORE, Plaintiffs, as Co-Administrators of the Estate, upon the trial of this matter before a jury, prays that the Court enter judgment for Plaintiffs and order the following relief:

1. Judgment against Defendant McFadden in his official capacity under principles of *respondeat superior*, and against Defendant Fleming, Defendant Fetherson, and Defendant King individually, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

98

2. Judgment against Defendant Englert, Defendant Elliott-McLaren, Defendant Smith, Defendant Warren, and Defendant Wellpath, LLC jointly and severally, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

3. Judgment against Defendant McFadden in his individual and official capacity, and against Defendant Mecklenburg County, and against Defendant Fleming, Defendant Fetherson, and Defendant King in their individual capacities, under 42 U.S.C. § 1983 for compensatory damages.

4. Judgment against Defendant Fleming, Defendant Fetherson, and Defendant King in their individual capacities under 42 U.S.C. § 1983 for punitive damages.

5. Judgment against Defendant Englert, Defendant Elliott-McLaren, Defendant Smith, R.N., Defendant Warren, Defendant Biondi, Defendant H.I.G., Defendant Hallman, and Defendant Wellpath, LLC jointly and severally, under 42 U.S.C. § 1983 for compensatory damages and punitive damages.

6. An award of treble the compensatory damages against Defendant McFadden, Mecklenburg County, Defendant Fleming, Defendant Fetherson, Defendant King, Defendant Englert, Defendant Elliott-McLaren, Defendant Smith, R.N., Defendant Warren, and Defendant Wellpath, LLC, under N.C.G.S. § 162-55.

7. An Order that Defendants pay Plaintiff's costs as allowed under 42 U.S.C. § 1988, including reasonable attorneys' fees.

8. That the Court grant such other and further relief as it deems equitable and just.

Respectfully submitted, this the 17th day of September, 2024.

**BY:**

*/s/ Ronard Dixon, Jr.*
Ronard Dixon, Jr. (NCSB: 49661)
**Hall and Dixon, PLLC**
725 East Trade Street Suite 115
Charlotte, NC, 28202
T: (704) 993-6825
F: (704) 413-3882
rcdixon@halldixonlaw.com

*/s/ M. Anthony Burts II*
M. Anthony Burts II (NCSB: 49878)
**Burts Law, PLLC**
P.O. Box 102
Newton, NC 28658
T: (704) 751-0455
F: (704) 413-3882
anthony@burtslaw.com

*/s/ Micheal L. Littlejohn, Jr.*
Micheal L. Littlejohn, Jr. (NCSB: 49353)
**Littlejohn Law, PLLC**
227 W. Fourth Street,
Charlotte, NC, 28202
T: (704) 322-4581
F: (704) 625-9396
mll@littlejohn-law.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing **AMENDED COMPLAINT** was electronically filed this day using the Court's CM/ECF system, which provides service to all registered counsel.

This the 17th day of September, 2024 ,

**BURTS LAW, PLLC**

*/s/ M. Anthony Burts II*
M. Anthony Burts II (NCSB: 49878)
anthony@burtslaw.com
PO Box 102
Newton, North Carolina 28658
Telephone: 704-751-0455

*Counsel for Plaintiff*